88 15
94 539

DANIEL LOVEJOY AND ELWIN W. LOVEJOY v. JACOB MICHELS.

*Sale—Combination to control prices—Public policy—Action for goods sold—Market price.*

1. Plaintiffs were manufacturers of machine knives, and shipped to the defendant upon his written order, but without any agreement as to price, two sets of hoop knives, charging him therefor the price fixed by an association embracing in its membership all of the knife-makers in the United States. One of the principal objects of the association was to *keep up prices,* and each member was obligated, under a penalty of $100, to sell only at the prices so fixed, which were subject to change without notice. The defendant had purchased knives of another manufacturer during the two previous years at a lower price, which had been advanced by the association without notice to customers, and which advanced price was charged for the knives ordered by the defendant. The case was submitted to the jury upon the theory that a combination to fix prices was not unlawful if its purpose was to fix *reasonable* prices, and when the defendant sought to show that the price fixed in this case was not a fair market price, but above the market value, the court refused to permit such showing, and restricted the defendant to the *market price.* The plaintiffs recovered a judgment, in the reversal of which all of the Justices concur.

2. Mr. Justice McGrath filed an opinion, in which Morse, J., concurred, holding:

*a*—In *Richardson v. Buhl*, 77 Mich. 632, it was held that any combination to control prices was unlawful, as against public policy.

*b*—Independently of the unlawful character oɪ a combination of manufacturers to fix prices, such a price is no better evidence of value than one fixed by any vendor upon his wares, and is not a *market price*, within the contemplation of the law.

*c*—The market price of an article manufactured by a number of different persons is a price fixed by buyer and seller in an open market, in the usual and ordinary course of lawful trade and competition.

*d*—In the absence of an agreement, a price fixed by a combination of dealers does not bind the purchaser, nor will the law so far countenance such combinations as to regard prices fixed by them as even evidence of value.

3. Chief Justice Champlin filed an opinion, holding:

*a*—In executed contracts of sale upon credit, where the price is not agreed upon at the time of the sale, the law implies an understanding to pay what the commodity is reasonably worth; citing Benj. Sales, § 85; *Acebal v. Levy*, 10 Bing. 376.

*b*—A price *arbitrarily* fixed by a combination of manufacturers or dealers is not competent evidence to show a *reasonable price* for goods sold by members of the combination.

*c*—Such combinations are intended to stifle competition, which is a stimulus of commercial transactions, and to substitute that of unconscionable gain, whereby the participants become enriched at the expense of the consumer, beyond what he ought legitimately to pay under a healthy spirit of competition in the business community.

*d*—The effect of such combinations is the same as that of contracts in restraint of trade, and public policy places its reprobation alike upon both.

*e*—Combinations to control prices are against public policy, and void, because they have a mischievous tendency, and are injurious to the best interests of the State, which require that all legitimate business shall be open to competition; that the current prices of commodities shall be controlled by the law of supply and demand; that the laws of commerce shall flow in their accustomed channels, and not be diverted by combinations to control prices fixed by the arbitrary decision of interested parties.

*f*—In executory contracts of sale, where the goods have not been accepted, prices so fixed cannot be recovered; nor are

they a criterion of the market value or current price in an action brought for goods sold and delivered without an agreement as to price.

*g*—If there is no market value of manufactured goods, the evidence to establish their reasonable worth must necessarily be the cost of production, which includes the cost of labor and material, and a reasonable profit thereon.

4. Mr. Justice GRANT filed an opinion, concurred in by LONG, J., holding:

*a*—Associations of manufacturers are not necessarily unlawful, but may be entirely lawful, while an arbitrary price fixed by them will not bind a purchaser who has not expressly agreed to pay it.

*b*—The price of commodities bought and sold may be fixed by express agreement, by the market, or by the actual value; and this rule applies to daily commercial transactions between buyer and seller, where one orders, and the other completes the transaction by delivering the goods. If there is no express agreement and no market price, the contract is to pay what the commodity is reasonably worth.

*c*—A market price is one fixed by fair and open competition in an open market, where seller and buyer stand upon an equal footing.

*d*—If there be a "fair market price," distinguishable in law from the "market price," then there is no such thing as a "market price," binding upon sellers and buyers, unless they contract with express reference to it, but it must be left to a jury in each case to determine what is a fair market value. But a price fixed by a combination of sellers or of buyers is not a market price, and binds no one.

Error to Wayne. (Reilly, J.) Argued June 5, 1891. Decided October 16, 1891.

*Assumpsit.* Defendant brings error. Reversed. The facts are stated in the opinions.

*Conely, Maybury & Lucking,* for appellant, contended as stated in the opinion of Chief Justice CHAMPLIN, and—

1. The court erred, in that he clearly and distinctly indicated to the jury his opinion of the facts of the case, and the verdict

which he thought ought to be rendered, and in making an attack upon the credibility of the defendant; citing *Perrott v. Shearer*, 17 Mich. 54; *Blackwood v. Broun*, 32 Id. 107; *Hayes v. Hemer*, 36 Id. 376; *Richards v. Fuller*, 38 Id. 653, 656, 657; *Railroad Co. v. Kirkwood*, 45 Id. 51, 53; *People v. Lyons*, 49 Id. 82; *Wheeler v. Wallace*, 53 Id. 355, 362; *Chase v. Iron Works*, 55 Id. 139; *Springett v. Colerick*, 67 Id. 362. 371; *Davis v. Gerber*, 69 Id. 246, 253; *People v. Gastro*, 75 Id. 132.

*Bowen, Douglas & Whiting,* for plaintiffs, cited no authorities, and contended that—

1. The price charged for the knives was the market price, and such a price as Michels would have to pay if he bought them of any other dealer. It was a reasonable price, and no testimony was introduced to show that any unreasonable or unfair profit was made in charging it, or that similar knives could be made for any less sum and yield a fair profit.

2. This association was simply an organization of all of the knife manufacturers in the country, which, like hundreds of other associations of the same character, was doubtless organized for mutual advantage and protection. Its purpose was at stated intervals to call its members together, compare their experience in business, and fix upon such a schedule of prices as would yield to all a fair but not an unreasonable profit; and every member had an equal voice in fixing these prices, and in doing so they exercised their best judgment and experience.

3. The questions as to the reasonableness of price, whether the acts of the association were unlawful or not in fixing such price, and whether it was a proper one or not, were all properly submitted to the jury, who found in favor of the plaintiffs, and the judgment should stand.

McGRATH, J. Defendant is a manufacturer of machines for cutting hoops, in which certain knives are used. He had dealt in the same knives for eight years, and bought from White Bros., of ·Buffalo, N. Y. One of the plaintiffs called upon defendant in September, 1888, soliciting orders for knives. Prices were talked over, and defendant claimed that he exhibited to the plaintiff bills of knives which defendant had purchased from White Bros., and plaintiff said:

"We will furnish you them at the same price that you pay White Bros., and give you a better knife."

The bills showed the price per set to be $58.28. Defendant gave no order at that time.

In November following defendant ordered by letter, from plaintiffs, two sets of hoop knives. Nothing was said about prices in the order. Plaintiffs booked the order, and the goods were shipped, one set November 30 and the other December 5. Defendant testified that he was in a hurry for the knives, and that the bills came several days after the knives were received; that when he received the knives the machines were waiting for them, and his customers were waiting for the machines. The sole controversy in the case is as to the price which defendant shall pay for these knives. Plaintiffs claim $72.86 per set, and defendant admits an indebtedness of $58.28 per set.

Plaintiffs admitted that they were members of the Knife-Makers' Association; that this association at that time embraced all of the knife-makers in the United States; that the prices charged by plaintiffs and sought to be collected were fixed by the association; that one of the principal objects of the association was to keep up prices; that the members of said association agreed to sell at the prices fixed by the association, and that, in case of any violation of such agreement, the member violating should forfeit $100; that the prices were subject to change without notice; that during the year 1888 there was a change made by the association, and 20 per cent. added to the price. In answer to questions upon cross-examination, one of the defendant's witnesses said:

"The Knife-Makers' Association was formed 7 or 8 years ago to keep up prices. In the early part of 1889 we [a new firm which had gone into the business in 1889, and was not in the association] cut 10 per cent. on old

prices, making 30 per cent. off of list. Then later in the year the association cut 20 per cent. on old prices, being 10 per cent. below us. Then later on they cut 5 per cent. more about holidays, and present prices were made early in 1890, making 45 per cent. off the list. We followed to these figures."

Upon cross-examination of one of the plaintiffs, defendant's counsel sought to ascertain whether plaintiffs were governed in fixing prices by a printed schedule furnished by the association. Objection was made, and the court excluded the testimony, saying:

"The only question is as to the value; it don't make any difference how it was fixed. What could these knives be purchased for in the open market?"

Counsel asked defendant when upon the stand what, in his judgment, was a fair market price for the knives in November, 1888, but the court excluded the testimony, saying:

"Not what the fair market price was, but what the market price was,—what he could buy at from other manufacturers."

Defendant's counsel requested the court to charge the jury as follows:

"1. If you find that it was understood and agreed between Michels and Lovejoy, in September, 1888, that Lovejoy would make and furnish the knives to Michels at the same price as White had theretofore sold them, and that the order in question was given and accepted in pursuance of such agreement, then both parties are bound by it.

"2. If no price was agreed upon, then plaintiffs are entitled to recover the fair market value of the knives.

"3. In arriving at such value, you are not bound by the price fixed by the Knife-Makers' Association.

"4. The Knife-Makers' Association, under the evidence in this cause, was an unlawful combination for the purpose of fixing prices.

"5. In arriving at the fair market value of the knives in question, you will consider all the evidence in the

case, including the market value both before and after the time in question, and all other items of information as to the value, which have been admitted in evidence before you.

"6. Even if defendant could not have bought the goods elsewhere for less than the price fixed by plaintiffs, yet if you find from the evidence that such price was an arbitrary one, beyond the true value, temporarily maintained by an unlawful combination of manufacturers, then you are not bound by such price, but may fix the true market value from all the evidence in the case."

These requests were refused. The charge of the court contains the following:

"Mr. Michels contends that he had some conversation with one of the plaintiffs in this case in September, when he was here, with reference to making certain knives, and he urges that his understanding at that time was that these knives should be made at the price that he had been paying for them heretofore, although there was nothing said with reference to these particular knives. Now, if there was any such understanding between Mr. Michels and the plaintiffs, why didn't he mention it in the letters that he wrote them after these goods were received? One of these letters was dated January 10, 1889, and it seems, from an inspection of these letters,—and they have been read to you,—that he made no reference whatever, in complaining of the price of these knives, that these knives were made by the plaintiffs for a price agreed upon in September. Now, Mr. Lovejoy says that no such conversation ever took place as claimed by Mr. Michels. Mr. Michels says there was such a conversation. It is for you to determine whether there was or not. If there was, how does it happen that no reference to it was made in these letters to the plaintiffs in January, 1889, after the receipt of these goods?

"Now, there is another thing as bearing upon this price. These goods were made and shipped to Mr. Michels, he claiming that they were, as he supposed, to be $58 a set; but it appears that there was an invoice sent with these goods at the time. Now, if the price was as contended by him, would he not, in the ordinary course of business, have made some complaint at once upon the receipt of

these goods, seeing that they were charging for them 20 per cent. more than he supposed he was to pay? This testimony in this case should be considered in all its bearings as determining the dispute between the parties.

"On the part of the defendant, it is further contended that there was an unlawful combination between the manufacturers of such articles as these, for the purpose of enhancing their price or putting their price beyond the real market value. If that is so, such a combination is unlawful, and the mere fact that the price is fixed in an arbitrary manner like that is not binding upon the jury in determining the real market value of the property. On the part of the plaintiffs it is admitted that there was such an association or organization of the manufacturers of knives or edge-tools of this country; that they got together, and put reasonable prices only upon their goods. Well, if that is a fact, then there would be nothing unlawful in such a combination as that. If they combine for the purpose of putting a fictitious value upon their goods, or for the purpose of driving small manufacturers out of the business by putting their goods down to a lower price that the market price, and below what they can be made for, and do this for the purpose of ruining such other manufacturers, such a combination is unlawful. It is a question of fact, to be determined *from what took place between these men*, whether the association was unlawful or not. The fact that there is an association would not justify the inference that it was unlawful or that it was formed for a purpose contrary to law.

"If, without any reason, they put an additional 20 per cent. upon these knives, merely using this power that they had arbitrarily for the purpose of controlling the market, that would be unlawful on their part; but if, on the other hand, as it is claimed, there was a great risk connected with the making of these particular knives, and, on account of the nicety of the work required and the extreme risk, these manufacturers felt that it was just and right and proper, for the purpose of protecting themselves against loss, to fix a fair market price for this work, and they put this 20 per cent. on it, I should say it was a legitimate act."

The trial judge heard and submitted the case upon the theory that a combination to fix prices was not unlawful

if the purpose was to fix reasonable prices, and when defendant sought to show that the prices fixed were not fair market prices, and were above the market value, the court refused to permit him to do so, and restricted him to the market price, when, as a matter of fact, the association embraced all the manufacturers, and the only "market price" was that fixed by the association.

In *Richardson v. Buhl*, 77 Mich. 632, this Court held that any combination to control prices was unlawful, as against public policy. In the present case, as in that, it was claimed that the combination had in fact reduced prices, and upon that point the Court say:

"It is no answer to say that this monopoly has in fact reduced prices. That policy may have been necessary to crush competition. The fact exists that it rests in the discretion of this company at any time to raise the price to an exorbitant degree."

In the present case no price was agreed upon at the time the order was given, and there was no evidence tending to show that defendant had any knowledge of the price fixed by the association. An attempt is made to fasten a price fixed by a combination upon such a purchaser. It is sufficient to know that the price sought to be imposed is that fixed by the combination. If so, it was unlawfully fixed, and has no force as a market price for that reason. It is the combination for the purpose of controlling prices that is unlawful, and the fact that they, the manufacturers, deemed the prices fixed to be reasonable, does not purge it of its unlawful character.

Independently of the unlawful character of the combination fixing it, a price so fixed cannot be regarded as any better evidence of value than that fixed by any vendor upon his own wares. A price so fixed is not to be entitled to rank as the market price. It is not a market price, within the contemplation of the law. The market

price of an article manufactured by a number of different persons is a price fixed by buyer and seller in an open market, in the usual and ordinary course of lawful trade and competition. It cannot be divested of these incidents, and retain its character. Associations of this character give the buyer no voice, and close the market against competition. In *Acebal v. Levy*, 10 Bing. 376, cited in Benjamin on Sales, § 86, the court declared that, when there was no express contract as to price, the price is to be a reasonable price,—

"Such a price as the jury upon the trial of the cause shall, under all the circumstances, decide to be reasonable. This price may or may not agree with the current price of the commodity at the port of shipment at the precise time when such shipment is made. The current price of the day may be highly unreasonable from accidental circumstances, as on account of the commodity having been purposely kept back by the vendor himself, or with reference to the price at other ports in the immediate vicinity, or from various other causes."

In *James v. Muir*, 33 Mich. 223, 227, Mr. Justice CAMPBELL, speaking for the Court, says:

"According to *Acebal v. Levy*, there is at least no implication of a promise to pay at what may happen to be the market rate, which may not be always, as there held, a reasonable rate."

In *Kountz v. Kirkpatrick*, 72 Penn. St. 376, the court say:

"Ordinarily, when an article of sale is in the market, and has a market value, there is no difference between its value and the market price, and the law adopts the latter as the proper evidence of the value. This is not, however, because 'value' and 'price' are really convertible terms, but only because they are ordinarily so in a fair market. * * * The market price of an article is only a means of arriving at compensation; it is not itself the value of the article, but is the evidence of value. The law adopts it as a natural inference of fact, but not

as a conclusive legal presumption. * * * Without adding more, I think it is conclusively shown that what is called the 'market price,' or the quotations of the articles for a given day, is not always the only evidence of actual value, but that the true value may be drawn from other sources, when it is shown that the price for the particular day has been unnaturally inflated."

It has frequently been held that the value of a commodity is not to be determined by the necessities of a particular buyer or the demands of a particular seller. If the "current price" is not conclusive upon the purchaser, because the vendor may have by some act of his own made that price unreasonable, or if it may be shown that the market price had been unnaturally inflated, how can it be said that a price fixed by a combination of the manufacturers of a given article, with sole reference to their interests, is to govern, to the exclusion of all other considerations? In such case there is no market price, and evidence of a fair market price or a fair market value is clearly admissible. In the absence of an agreement, a price fixed by a combination of dealers does not bind the purchaser, nor will the law so far countenance such combinations as to regard prices fixed by them as even evidence of value.

The argumentative portion of the charge, relating to the letters written by defendant, was clearly erroneous. It could not fail to convey to the jury the impression formed by the trial judge regarding that testimony, and to give direction to their judgment. All inferences to be drawn from the testimony are exclusively for the jury, and not for the court. *Richards v. Fuller,* 38 Mich. 656; *People v. Gastro,* 75 Id. 132, and cases cited. It is no part of the duty of the court to convince the jury as to matters of fact.

The judgment must be reversed, and a new trial ordered, with costs to defendant.

MORSE, J., concurred with McGRATH, J.

CHAMPLIN, C. J.  In executed contracts of sale upon credit, where the price is not agreed upon at the time of sale, the law implies an understanding to pay what the commodity is reasonably worth.  Benj. Sales, § 85.

In *Acebal v. Levy*, 10 Bing. 376 (25 Eng. Com. Law, 180), the declaration alleged that the plaintiff had sold to the defendants a cargo of nuts at a certain value, namely, the then usual and common shipping price for nuts at the port where the cargo was shipped, and that in consideration thereof defendants undertook and faithfully promised to accept the said nuts, and pay the plaintiff for the same, on delivery thereof to the defendants.  The declaration then alleged that the usual and common shipping price and value of the nuts at the port of shipment was at a certain rate, naming it; and that they were ready to deliver, and offered to deliver, the nuts to the defendants, but they refused to accept.  In deciding the case, Chief Justice Tindal said:

"Whether, in all cases of an executory contract of purchase and sale, where the parties are altogether silent as to the price, the law will supply the want of any agreement as to price by inferring that the parties must have intended to sell and to buy at a reasonable price, may be a question of some difficulty.  Undoubtedly, the law makes that inference where the contract is executed by the acceptance of the goods by the defendant, in order to prevent the injustice of the defendant taking the goods without paying for them.  But it may be questionable whether the same reason applies to a case where the contract is executory only, and where the goods are still in the possession or under the control of the seller."

And he further says:

"A contract to furnish a cargo at a reasonable price means such a price as the jury upon the trial of the cause shall, under all the circumstances, decide to be

reasonable. This price may or may not agree with the current price of the commodity at the port of shipment at the precise time when such shipment is made. The current price of the day may be highly unreasonable from accidental circumstances, as on account of the commodity having been purposely kept back by the vendor himself, or with reference to the price at other ports in the immediate vicinity, or from various other causes."

This case is cited and approved in *James v. Muir*, 33 Mich. 223. The principle underlying the decision is that the vendor cannot be permitted, by withholding the commodity from market or otherwise, to fix the current price of the commodity, and thus fasten upon the purchaser an implied agreement to pay such price. If the plaintiffs in this suit, by combining with other manufacturers or dealers, can thus arbitrarily establish the current price of the commodity sold, and if the purchaser can be held to have impliedly promised or agreed to pay the price so established, it follows that he may be obliged to pay a highly unreasonable price. I do not think a price so fixed by a combination of manufacturers or dealers is competent evidence to show a reasonable price of goods sold by the members of such combination.

Such combinations to control prices are intended to stifle competition, which is a stimulus of commercial transactions, and to substitute therefor the stimulus of unconscionable gain, whereby the participants in such combinations become enriched at the expense of the consumer, beyond what he ought legitimately to pay under a healthy spirit of competition in the business community. The effect of such combinations to control prices is the same as that other class of contracts which has always been denounced as vicious, namely, contracts in restraint of trade. Public policy places its reprobation upon one equally with the other. These combinations to control prices are becoming very numerous, and affect, not only

the staples of human sustenance, but nearly all the necessaries of life and the necessaries of business. Such combinations to control prices are against public policy, and void, on the ground that they have a mischievous tendency, so as to be injurious to the best interests of the State. The best interests of the State require that all legitimate business should be open to competition; that the current price of commodities should be controlled by the law of demand and ·supply; that the laws of commerce should flow in their accustomed channels, and should not be diverted by combinations to control prices fixed by the arbitrary decision of interested parties. Of course, what is said· above does not apply to monopolies authorized by law; as, for instance, to patented articles. The odious features of illegal monopolies are plainly apparent. These can absolutely control the prices which the public shall pay, and 'it is this monopolistic feature of such combinations to control prices which stamps them as odious, because they exercise the franchises of the monopoly without the legal right. These views are supported in the following cases: *Anderson v. Jett* (Ky.), 12 S. W. Rep. 670; *Railway Co. v. Closser*, 126 Ind. 348 (26 N. E. Rep. 159); *People v. Sugar Refining Co.*, 54 Hun, 354 (7 N. Y. Supp. 406); *Richardson v. Buhl*, 77 Mich. 632; *Carbon Co. v. McMillin*, 119 N. Y. 46; *Stanton v. Allen*, 5 Denio, 434; *Coal Co. v. Coal Co.*, 68 Penn. St. 173; *Arnot v. Coal Co.*, 68 N. Y. 558; *Salt Co. v. Guthrie*, 35 Ohio St. 666; *Association v. Kock*, 14 La. Ann. 168; *Railroad Co. v. Railroad Co.*, 15 Fed. Rep. 650; *Hilton v. Eckersley*, 6 El. & Bl. 47; *Transportation Co. v. Pipe Line Co.*, 22 W. Va. 600, 617; *Telegraph Co. v. Telegraph Co.*, 65 Ga. 160; *Craft v. McConoughy*, 79 Ill. 346; *Raymond v. Leavitt*, 46 Mich. 447; *Faulds v. Yates*, 57 Ill. 416; *Wright v. Ryder*, 36 Cal. 342.

I have no doubt that in executory contracts of sale,

where the goods have not been 'accepted, such price so fixed cannot be recovered; and I am also of opinion that such price so fixed is no criterion of the market value or current price in an action brought for goods sold and delivered, where no price has been agreed upon. In this case the goods have been ordered and accepted without any reference to the price to be paid, and the law presumes that defendant intended to pay what the knives were reasonably worth. As pointed out in *James v. Muir*, 33 Mich. 223, the market value and the reasonable worth of a commodity are not always the same. Ordinarily the market value is evidence of what goods are reasonably worth. *Kountz v. Kirkpatrick*, 72 Penn. St. 376, 386; Benj. Sales, § 86. If there be no market value of manufactured goods, the evidence to establish the reasonable worth must necessarily be the cost of production, which would include the cost of labor and material, and a reasonable profit on the cost of production. The testimony must be submitted to the jury, and it is their province to determine from such testimony the reasonable worth of such goods. It does not rest with the witnesses to swear what they are reasonably worth, but they · may state the facts from which the jury may determine the reasonable worth. Nor can this Court pass upon that question; it is one of fact and not of law. *Becker v. Hecker*, 9 Ind. 497. Generally speaking, it is competent for a witness, after he has been 'shown to be qualified to express an opinion as to the value of' the thing in dispute, to state to the jury what his opinion as to value is. But such opinions are not absolutely binding upon the jury, but only persuasive, and may be considered by them in arriving at their own conclusion. Thomp. Trials, § 380.

In order to pass upon the specific questions raised by the assignments of error, it is necessary to specify with

more particularity what the record shows. The declaration in this case was upon the common counts in *assumpsit*, and the bill of particulars for goods sold August 29, 1889. This, however, is not the true date of sale. The plea was the general issue, with notice of recoupment. On the trial in the circuit the plaintiffs claimed to recover $139.89 and interest. The defendant admitted the plaintiffs' claim to the amount of $116.58, less $6, under the plea of recoupment. Under the charge of the court the jury returned a verdict of $140.74, for which plaintiffs had judgment.

The sale of the goods was through a written order signed by defendant, and mailed to plaintiffs in November, 1888, for two set (six knives) hoop knives, one-half inch thick, to be so made that they would interchange one with the other. The plaintiffs are manufacturers of machine knives of all kinds, at Lowell, Mass. They received the order, and on November 30 and December 5, 1888, the knives were shipped to defendant, and received by him. The defendant claims that they were not exactly according to the pattern furnished, and that he expended some $6 in fitting them. On the same days the goods were shipped a bill was forwarded to defendant charging him $72.86 per set for the knives, and 20 per cent. extra for manufacturing so that they could be used as one knife, or $14.57 for this purpose. Thus the total bill for the two sets amounted to $174.86, from which the plaintiffs discounted 20 per cent. to the trade, leaving a balance of $139.89, the amount they claimed due them.

Elwin W. Lovejoy, one of the plaintiffs, testified that the plaintiffs charged the regular market price of $72 per set; that the price was $174.86 for the two sets, less discount to the trade of 20 per cent., making $139.89, which he testified was a reasonable charge, and was the

market price for the knives, exactly such as would be charged by other dealers for the same knives; and that the goods were sold on thirty days' time. He also testified that the plaintiffs made the knives from a pattern furnished them before that time, along in the summer, by Michels.

It appears from the testimony that plaintiffs are members of what is called the "Machine Knife-Makers' Association," and at the time of the trial all the manufacturers of knives in the United States were members of that association, with the exception of the Anderson Knife & Bar Works, located at Anderson, Ind.; but this association had not commenced the manufacture of knives at the time the goods in this case were sold. The association of which the plaintiffs were members was formed in 1882, for the purpose of keeping up the prices on the goods, and that such was its principal object was testified to by Lovejoy. Every member of the association is bound by agreement to maintain the prices fixed by the association, and there is a clause in the agreement that a man who does not sell at these prices shall forfeit $100. The plaintiffs agreed to sell at the regular prices fixed by the association. It further appears that the prices charged for the goods sold defendant are the regular prices fixed by the association, and the reason why the plaintiffs fixed these prices was because the association had before that fixed them at the same price. These prices are fixed twice a year, in January and July, and the witness Lovejoy testified that he was one of the persons who assisted in fixing the prices.

It also appears that in July, 1888, the association advanced the prices, as claimed by the witness, 20 per cent. from what had been the prices prior thereto in 1887 and 1886, and that no notice of such advances had been given to their customers; that at former prices

goods such as these sold to defendant had been sold at a fair profit; that the prices at which they had been fixed prior to July, 1888, was $58.28 a set, this price having also been fixed by the association; and it further appears that there had not been 20 per cent. difference in the cost of making knives. The association raised the price in July from $58.28 for knives such as those sold to defendant to $72.86, an increase of 25 per cent. The plaintiffs then added 20 per cent. more because defendant ordered them made so as to be used interchangeably, or $14.57 on each set, and then made a discount of 20 per cent. on the whole amount to the trade. The defendant had purchased such knives in 1886 and 1887 of a firm in Buffalo, N. Y., who were members of the association, and had charged therefor the prices fixed by it, namely, $58.28 a set, and defendant was aware that this price was fixed by the association.

It was the theory of plaintiffs that the price fixed by the association was the market price, because that price was what all the members of the association sold the goods for, and they produced several witnesses to testify that the price sued for was the market price; but these witnesses were members of the association, and testified that they regarded the prices fixed by the association as the market price. No other criterion to ascertain the reasonable worth of the goods sold was given by the plaintiffs' witnesses.

The defendant's theory was, first, that he had agreed with plaintiffs, in an interview with Mr. Lovejoy a short time before he gave the order, that plaintiffs should furnish the knives for the same price that he had been paying to the Buffalo firm; that the inducement held out by Lovejoy was that plaintiffs would make him a better article. This was denied by Lovejoy.

The defendant's contention, further, was that the

agreement made by the association to fix the prices, to which all the members were bound, embracing, as it did, nearly the whole of the manufacturers of such goods in the United States, and the whole, with one exception, was an unlawful combination, entered into for the purpose of controlling prices of such goods, based, not upon the market value or upon what such goods were reasonably worth, but upon the arbitrary determination of the members for the purpose of profit, and such price so fixed was no evidence of what such goods were reasonably worth; that his liability could not extend beyond the reasonable worth of such goods; that the price charged for which plaintiffs sued and recovered was unreasonable; and, as relevant to this issue, he claimed the right to show by the plaintiffs' witness Lovejoy, who had, with others, raised the price 25 per cent., and had testified that such price was reasonable, that in June, 1888, he was selling this same kind of goods for $58.28, and that the cost of production had not increased, and that in June plaintiffs regarded $58.28 as a reasonable price. I think, upon cross-examination of this witness, the defendant was entitled to inquire of him, "What was the price of these knives in June, 1888?" and that the court erred in excluding the answer. He also erred in not permitting the witness Lovejoy to answer this question: "Was there any increase in the cost of making these knives in November from what there was in June?"

Defendant's counsel requested the court to charge the jury as follows:

"1. If you find that it was understood and agreed between Michels and Lovejoy in September, 1888, that Lovejoy would make and furnish the knives to Michels at the same price as White had theretofore sold them, and that the order in question was given and accepted

in pursuance of such agreement, then both parties are bound by it."

This request was given, but in language and with observations which counsel for defendant deemed subject to exception. The learned judge said:

"Mr. Michels contends that he had some conversation with one of the plaintiffs in this case in September, when he was here, with reference to making certain knives, and he urges that his understanding at that time was that these knives should be made at the price that he had been paying for them heretofore, although there was nothing said with reference to these particular knives. Now, if there was any such understanding between Mr. Michels and the plaintiffs, why didn't he mention it in the letters that he wrote them after these goods were received? One of these letters was dated January 10, 1889, and it seems from an inspection of these letters,—and they have been read to you,—that he made no reference whatever, in complaining of the price of these knives, that these knives were made by the plaintiffs for a price agreed upon in September. Now, Mr. Lovejoy says that no such conversation ever took place as claimed by Mr. Michels. Mr. Michels says there was such a conversation. It is for you to determine whether there was or not. If there was, how does it happen that no reference to it was made in these letters to the plaintiffs in January, 1889, after the receipt of these goods?

"Now, there is another thing as bearing upon this price. These goods were made and shipped to Mr. Michels, he claiming that they were, as he supposed, to be $58 a set; but it appears that there was an invoice sent with these goods at the time. Now, if the price was as contended by him, would he not, in the ordinary course of business, have made some complaint at once upon the receipt of these goods, seeing that they were charging for them 20 per cent. more than he supposed he was to pay? This testimony in this case should be considered in all its bearings as determining the dispute between the parties."

We have had occasion heretofore to call attention to

the impropriety of the trial judge calling the attention of the jury to a particular part of the testimony of a witness for comment, and everything that savors of argument had much better be left to the hired advocates of the parties. Some points in the testimony of a witness may strike a trial judge as inconsistent with disclosed facts, but there is danger of creating a prejudice against the witness, to the detriment of the rights of the parties, if the trial judge steps aside from instructions as to the law which governs a case to draw inferences from facts disclosed. It is exclusively within the province of the jury to draw such inferences. Every one reading this charge, and any one hearing it given, must have been impressed with the idea that the trial judge did not believe the testimony of the defendant, Michels. He pointed out inferences which might be drawn by the jury which were apparently inconsistent with the idea of a contract. He failed to observe upon the testimony of the plaintiff, given upon his direct examination, that "we made the knives from a pattern furnished before that time, along in the summer, by Michels," and the inference that might be drawn therefrom; and he might have added, with equal pertinency, why, if there had been no contract or agreement previous to the written order, had Michels furnished plaintiffs with a pattern for the knives? I mention this for the purpose of showing the impropriety of attempting an argument to the jury by a judge upon the facts, unless it is argued fully for both sides. These witnesses were parties, and their testimony was conflicting, and their credit should have been left to the jury, without pointing out upon one side inferences which might tend to affect it. *Williams v. Shelden*, 61 Mich. 315; *Bulen v. Granger*, 63 Id. 311; *People v. Finley*, 38 Id. 486; *Springett v. Colerick*, 67 Id.

362; *People v. Gastro,* 75 Id. 127; *Kelly v. Emery,* Id. 147.

The court further charged the jury as follows:

"On the part of the defendant, it is further contended that there was an unlawful combination between the manufacturers of such articles as these, for the purpose of enhancing their price or putting their price beyond the real market value. If that is so, such a combination is unlawful, and the mere fact that the price is fixed in an arbitrary manner like that is not binding upon the jury in determining the real market value of the property. On the part of the plaintiffs, it is admitted that there was such an association or organization of the manufacturers of knives or edge-tools of this country; that they got together, and put reasonable prices only upon their goods. Well, if that is a fact, then there would be nothing unlawful in such a combination as that. If they combine for the purpose of putting a fictitious value upon their goods, or for the purpose of driving small manufacturers out of the business by putting their goods down to a lower price than the market price, and below what they can be made for, and do this for the purpose of ruining such other manufacturers, such a combination is unlawful. It is a question of fact, to be determined from what took place between these men, whether the association was unlawful or not. The fact that there is an association would not justify the inference that it was unlawful or that it was formed for a purpose contrary to law.

"If, without any reason, they put an additional 20 per cent. upon these knives, merely using this power that they had arbitrarily for the purpose of controlling the market, that would be unlawful on their part; but if, on the other hand, as it is claimed, there was a great risk connected with the making of these particular knives, and, on account of the nicety of the work required and the extreme risk, these manufacturers felt that it was just and right and proper, for the purpose of protecting themselves against loss, to fix a fair market price for this work, and they put this 20 per cent. on it, I should say it was a legitimate act."

What I have said in the beginning of this opinion

need not be repeated. Much that is said in the instruction is a correct statement of the law, but testimony was ruled out that would have thrown light upon the question as to whether the purposes of the association are only "to put reasonable prices upon their goods." The testimony of the members of the association cannot be taken as undisputed or indisputable. On the contrary, the testimony in the case before referred to was sufficient, in my judgment, to condemn the object of this association as unlawful. The reasonableness of the prices must depend upon the cost of production, the cost of material used, the risks of the business, the labor of producing, the demand for the goods, and all those facts which tend to show the reasonable worth of the articles; and there can be no market value of the articles where their current price is not affected by competition, but, on the other hand, competition is disarmed by combination, and the price is fixed arbitrarily by the sellers, to which all engaged in selling must conform.

The judgment should be reversed, and a new trial granted.

GRANT, J. This suit is brought to recover the price of two sets of knives used in hoop-machines.

Plaintiffs carried on their business in Lowell, Mass., while the defendant resided and did business in Detroit, Mich. Defendant sent a written order in November, 1888, without any reference to price.

1. Defendant's counsel insist that these goods were ordered in reliance upon an agreement made in September previous between himself and plaintiff E. W. Lovejoy, who visited him in Detroit. Defendant's version of the conversation then had fails to establish an agreement. Mr. Lovejoy at that time solicited an order, but defendant told him he did not need any knives then, and made no promise to order any in the future. This claim

of defendant is based entirely upon the statement of defendant, which is that he showed Mr. Lovejoy some bills of knives purchased from White Bros., and that Lovejoy said: "We will furnish you them at the same price that you pay White Bros." This conversation was two months or more prior to the written order of defendant. There is not a *scintilla* of evidence tending to show any agreement, or even understanding, that defendant would order goods from plaintiffs in consequence of this statement, or any other. Courts cannot manufacture contracts for parties out of such statements. Did defendant agree to buy? Did he agree to order? If he agreed to do either, when was the contract to be performed? Was this a standing offer to be accepted by defendant at any time in the future? Furthermore, defendant in his written order made no reference to this conversation, nor did he testify that he gave it relying upon Lovejoy's statement. The court left it to the jury to determine whether this conversation constituted an agreement. The alleged erroneous instructions of the court upon this branch of the case become immaterial, for the finding of the jury was such as the court should have instructed them to find.

2. The price charged was $72.86 per set, with 20 per cent. extra used as one knike. From the total bill a discount of 20 per cent. was allowed, leaving the amount claimed $139.89. Defendant admitted his liability for all except 20 per cent., added as hereinafter stated, and amounting to $23.31. This price was fixed by the Machine Knife-Makers' Association of the United States, of which plaintiffs were members, and which then embraced all the knife-makers in the United States. Under its rules, its members were required to charge association prices, under a penalty of $100 for neglect to do so. These knives were what were called "special

knives," so made as to form in reality one knife. Evidence on the part of the plaintiffs showed that greater care was required in their manufacture than in that of ordinary knives, and that the price charged afforded a reasonable profit.

Defendant's counsel requested the court to instruct the jury that this combination was unlawful. This the court refused, but did instruct them that an arbitrary price fixed by such an association was not binding upon them in determining the market value of the property, but that there was nothing unlawful in their combining and putting reasonable prices upon their goods; that the fact that there is an association would not justify the inference that it was unlawful, or that it was formed for a purpose contrary to law; that—

"If, without any reason, they put an additional 20 per cent. upon these knives, merely using this power that they had arbitrarily for the purpose of controlling the market, that would be unlawful on their part; but if, on the other hand, as it is claimed, there was a great risk connected with the making of these particular knives, and, on account of the nicety of the work required and the extreme risk, these manufacturers felt that it was just and right and proper, for the purpose of protecting themselves against loss, to fix a fair market price for this work, and they put this 20 per cent. on it, I should say it was a legitimate act."

Associations of manufacturers are not necessarily unlawful. The evidence does not show that the sole object of this association was to control prices. The association might be entirely lawful, while an arbitrary price fixed by it would not bind a purchaser who had not expressly agreed to pay it. The court would certainly have been justified, under the plaintiffs' evidence, in instructing the jury that this 20 per cent. so fixed by this association did not bind the defendant, and did not make a market price. But, in addition to the instruction I have

above quoted, the court instructed the jury that the combination was unlawful if formed for the purpose of enhancing. the price, or putting it beyond the real market value. There was no evidence that the price was unreasonable, or afforded more than a fair profit. The only error in these instructions was in not informing the jury that as to this 20 per cent. there was no evidence of a market value,—for a combination cannot fix a price arbitrarily, and make it the market price,—and that the only question for them was the reasonable worth of the knives. But the failure so to instruct the jury is not complained of. If the case made was one for a jury to determine the "fair" or "real" market value, I think the charge fairly submitted that question to the jury, and that no error was committed in refusing to charge that the association was unlawful.

3. Did the court commit any errors in rejecting testimony offered by the defendant? The defendant was asked by his counsel to state the fair market value of these knives. The court rejected this testimony as incompetent, but limited the question to the market price. It is insisted that this ruling limited him to the price fixed by the association. The price of commodities bought and sold may be fixed in three ways:

1. By express agreement.
2. By the market.
3. By the actual value.

It must be remembered that we are dealing with an executed contract, one of those daily commercial transactions between buyer and seller, where the one orders, and the other completes the transaction by delivering the goods. In such cases the price must be determined in one of the three ways above mentioned. If there be no express agreement and no market price, the contract then is to pay what the commodity is reasonably worth.

As already shown, there was no express agreement as to price, and no market price. Therefore the only issue to be tried was, was this additional 20 per cent. reasonable, affording only a fair profit to the plaintiffs?

A market price is the price fixed by fair and open competition in an open market, where sellers and buyers stand upon an equal footing. Legally the price so established is fair, and fixes the reasonable worth of the commodity. When the price is high, the purchaser may call it unfair; when the price is low, the seller may call it unfair; but in law both are fair, and, in the absence of any express agreement, seller and purchaser alike contract with reference to it. Upon no other basis can the great commercial transactions of the world be carried on. The immense granaries of this country are filled with products which represent labor, some of which has been remunerative, and other unremunerative, according to the character of the soil and the industry and management of the laborers and other conditions. If the market price of wheat reaches $1.25 to $1.50 per bushel, will a purchaser be permitted by the law to say to the farmer who sells: "That is not a fair market price; it allows you too much profit, and therefore is not binding upon me?" On the other hand, if the market price of the same commodity is so low as not to afford the farmer a reasonable profit, can he say to the purchaser of his grain: "The market is unfair, and affords me no profit, and therefore you must pay more?" If there be a "fair market price," distinguishable in law from the "market price," then there is no such thing as a "market price," binding upon sellers and buyers, unless they contract with express reference to it, but it must be left to a jury in each case to determine what is the fair market value. The same rule must apply to manufactured commodities, the price of which is ordinarily fixed by such

competition in an open market. But a price fixed by a combination of sellers or of buyers is not a market price, and binds no one. The testimony was therefore, in my judgment, properly rejected by the court.

4. A witness for plaintiffs testified that if he had made the same knives for defendant he would have charged the same price that plaintiffs charged, and that it was a "fair market price." Upon cross-examination, he was asked the price he had manufactured them for before. This testimony was rejected by the learned circuit judge upon his own motion, and without any objection from plaintiffs. This testimony was competent, and should have been admitted.

5. During the progress of the trial the court, in the presence of the jury, used the following language: "The only question is as to the value; it don't make any difference how it is fixed. What could these knives be purchased for in the open market?" I think these and other similar remarks were erroneous, for the reasons above given, and tended to mislead the jury; and for these errors the verdict should be set aside, and a new trial ordered.

I do not think that the defendant presented his case upon the proper theory, and therefore no costs should be allowed. The testimony he offered and his requests to charge were based solely upon the idea of a fair market value.

LONG, J., concurred with GRANT, J.