### C. G. BLAKE CO. v. UNITED STATES.

#### (District Court, S. D. Ohio, W. D. March 4, 1921.)

#### No. 2918.

1. **Eminent domain ⟨⟩131—Compensation measured by market value, if there is a market, notwithstanding government regulations, floods, etc., affecting market.**

    Where one is entitled to compensation based on the value of property, the measure of recovery, where such property can be procured in the market, is its market value, even though such market value is affected by laws and governmental regulations affecting the sale of such property, drouths, floods, commercial panics, crop failures, labor difficulties, or other similar causes; the true value being otherwise determined only where there is no market value.

2. **Evidence ⟨⟩113(21)—Compulsory sales and purchases not indicative of true market value.**

    Compulsory sales and purchases are not indicative of true market value.

3. **War ⟨⟩14—Evidence held to show market value of coal in action against government for compensation for requisitioned coal.**

    In suit against the United States government for compensation for coal requisitioned under National Defense Act, § 10 (Comp. St. 1918,

⟨⟩For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Comp. St. Ann. Supp. 1919, § 3115⅛ii), evidence as to the range of prices that obtained throughout seven months at different cities for coal of the same grade as that requisitioned, f. o. b. mines, *held* sufficient to show a market value, as against contention that the sales were extraordinary, unusual, and forced sales, and therefore not indicative of the true market value.

**4. War ☞14—Compensation for requisitioned coal held measured by market value, and not cost plus a reasonable profit.**

Owner of coal requisitioned for the maintenance of the United States Navy under National Defense Act, § 10 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115⅛ii), suing the government for "just compensation" under such statute, was entitled to the market value, notwithstanding abnormal condition of market resulting from the war and governmental regulations, and was not limited to the cost of production plus a reasonable profit.

In Equity. Suit by the C. G. Blake Company against the United States. Decree for the plaintiff.

Murray Seasongood, of Cincinnati, Ohio, for plaintiff.

Allen C. Roudebush, Asst. U. S. Atty., of Cincinnati, Ohio, and Howard W. Ameli, Asst. Atty. Gen.

PECK, District Judge. The President of the United States, acting by the Secretary of the Navy, requisitioned of the plaintiff, under section 10 of the National Defense (Lever) Act of August 10, 1917 (U. S. Comp. Stat. 1918, Comp. St. Ann. Supp. 1919, § 3115⅛ii), as necessary to the maintenance of the navy, on June 30, 1920, 48.75 gross tons; on July 17, 1920, 3,984 gross tons; on August 20, 1920, 3,003 gross tons; and on September 18, 1920, 1,613 gross tons—of New River run of mine bunker coal, fixing a price of $4 per gross ton, f. o. b. mines, for the same, which the plaintiff declined to accept. Plaintiff was paid $3 per ton by the government on account, and, in accordance with the provisions of the act, brings this suit to recover "such further sum as, added to said seventy-five per centum, will make up such amount as will be just compensation," which, it avers, is not less than $5.60 per gross ton, f. o. b. mines. The government answers that just compensation is not $5.60 per ton, but the sum allowed. The action is submitted on the evidence, without the intervention of a jury.

It is not disputed by the government that coal of the grade in question was freely sold in the open market throughout the period covered by the requisitions at prices as high or higher than claimed by the plaintiff. It is the government's contention, however, that on account of abnormal conditions, resulting from the war and other causes, there was no true or fair market, and no such thing as fair market value; that market value, in and of itself, is not the end to be sought in the present investigation, but that the goal of this proceeding is just compensation; that where there is no fair market there can be no fair market value; that therefore some other standard must be sought; and that the true measure of just compensation, under the circumstances of this case, is the cost of production, including the expense of operation, maintenance, depreciation, and depletion, plus a just and reasonable profit.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

The evidence shows that the market price of coal sold for consumption within the United States during the period ranged from $5 to $10, and even as high as $14, per ton; but after the 1st of July it was not less than $5.60 a ton. The market reached its peak in the middle or latter part of August, when the quotations ranged from $8 to $14 a ton, and receded somewhat thereafter. Coal of the same character sold at tidewater for export purposes at prices ranging from $14 to $20 per gross ton. It is true that the Navy Department received five bids upon April 6th, for an aggregate of 285,000 gross tons, at prices ranging from $4.37 to $5, and upon May 18th three bids for an aggregate of 185,000 tons at from $4.48 to $4.82 per ton. These bids were for a very small part of the navy requirement of about 1,200,000 tons, and were received in response to a letter requesting bids sent to those upon the navy list of approved producers, in which it was stated, in substance, that, unless sufficient coal was thus secured, the department would have to continue the practice of requisitioning. In the latter event the producer would either be compelled to accept the price fixed by the department, or, having been paid three-fourths thereof, to sue for the remainder. These bids cannot, therefore, be considered as entirely voluntary quotations. The department rejected them on the ground that the quantity was too small and the price too high.

The United States Fuel Administration had relinquished control of prices April 1, 1920. It is true that the market was extremely irregular, and that the price was frequently dictated largely by the buyers' necessities. Many large dealers, including plaintiff, limited themselves, however, so far as their domestic business was concerned, to prices much below what could have been asked, for the purpose of retaining the good will of their customers for future business, and in view of the provisions of the fourth section of the Lever Act, the unconstitutionality of which was then not decided, restricting dealers to reasonable prices. Certain so-called priority orders of the Interstate Commerce Commission, by which freight cars were ordered to certain portions of the United States for the purpose of relieving local coal shortages, undoubtedly had a tendency to raise prices at some places and reduce them elsewhere. The demand was abnormal as the immediate aftermath of the war, and the supply was curtailed by labor troubles and car shortages. But, when all has been considered, the fact remains that the total coal output of the country, some 600,000,000 tons, including about 35,000,000 tons of the character of that in question, was sold and bought, for the most part, by voluntary transactions, and by persons under no restrictions or necessities, except the restraints of law and the needs that ordinarily impel consumers to buy fuel.

[1] The general rule is, of course, that where one is entitled, in any form of action, to compensation based on the value of property, the measure of recovery, where such property can be procured in the market, is the value of it in the market, and not the cost; but, when there is no market value, the true value must be determined in some other way, from such elements of value as are attainable. Sedgwick on Damages, §§ 244, 250. The abnormalities of the market, on which the government relies to set aside the ordinary rule and invoke the excep-

tion, are of two classes—those resulting from governmental regulation, and those consequent upon unusual commercial conditions following the hostilities and accompanying a technical state of war.

The fact that laws and governmental regulations affect the sale of commodities does not abrogate the settled rule that market value is just compensation. All transactions in the commercial world are more or less affected by such conditions. Tariffs, transportation regulations, and various legal restraints and restrictions are in constant operation. Neither does the fact that unusual conditions affect the market mean that there is no market or market price. Drouths, floods, commercial panics, crop failures, labor difficulties, and other causes frequently affect markets seriously, but not so as to warrant a court, when assessing compensation consequent upon the exercise of the right of eminent domain, in saying that there is no market. The effects of war may differ in degree, but, so long as a market—that is, a general buying and selling of the commodity—exists, the rule persists.

Of the cases cited by the government that most nearly sustaining its contention is Kountz v. Kirkpatrick & Lyons, 72 Pa. 376, 13 Am. Rep. 687, an action for damages for failure to deliver oil pursuant to an assigned contract. By the day fixed for delivery an unlawful combination of dealers, including the original purchasing party, but not his assignee, had gained control of the market, and had forced the price up temporarily to a greatly inflated figure. A few days later the price dropped to the normal. The real plaintiff, for whose benefit the suit was prosecuted, was innocent of this inflation. It was held that "value" and "market price" are not always convertible terms; that there could be no difference in justice or law between an unnatural depression and an unnatural exaltation in the market price; that neither is the true and only measure of value; that, when the market price is unnaturally inflated by unlawful and fraudulent practices, it cannot be the true means of ascertaining what is unjust compensation. It was concluded (two of the five justices dissenting) that it was a fair question for the jury to determine whether the price which was demanded for the oil on the delivery day was not a fictitious, unnatural, inflated, and temporary price, the result of a combination to "bull" the market, as it was termed, and to compel sellers to pay a false and swollen price in order to fulfill their contracts.

"If so," the court said, "then such price was not a fair test of the value of the oil, and the jury would be at liberty to determine, from the prices before and after the day, and from other sources of information, the actual market value of the oil on the 31st of December 1869" (delivery day). "Any other cause [course] would be unjust and injurious to fair dealers, and would enable gamblers in the article to avail themselves of their own wrong, and to wrest from honest dealers the fruits of their business. * * * Men are not to be stripped of their estates by such cruel and wrongful practices, and courts of justice cannot so wholly ignore justice as to assume such a false standard of compensation."

It is to be noted that even there the court did not abandon the rule of market value, but, for the ascertainment of it, merely justified a departure in evidence from the exact date set for delivery. The plaintiff here does not seek to base its claim upon unusual sales at the precise

dates of requisition, but keeps well within the range of the market for a period of about seven months. Kountz v. Kirkpatrick was interpreted in the case of Vickery v. Foley, 17 Victoria Law Reports, 407, to hold merely that the price paid in the market on a particular day is not always the market value of the article on that day, and the court did not follow it in the case of an attempted, but unsuccessful, "corner" of a mining stock. Nor does the rule of the Kountz Case, decided nearly a half century ago, appear to have been elsewhere applied as against one innocent of the unlawful inflation of the market, and its soundness in that regard may well be doubted.

In the case of Lovejoy v. Michels, 88 Mich. 15, 49 N. W. 901, 13 L. R. A. 770, cited by the government, the court refused to allow the market value, because prices of the commodity there under consideration were dictated by an association of manufacturers, of which plaintiff was one, and it was held that the price arbitrarily fixed by such a combination was no more evidence of value than a price arbitrarily stated by any vendor for his wares, and not a market value, and therefore the court had recourse to the rule of cost of production plus a reasonable profit. There was, in effect, but one vendor, dictating the price and attempting to make it the measure of damages in an action at law for the reasonable worth of the goods. No such situation is before the court here.

The subject of market value artificially enhanced is treated by Sedgwick on Damages, vol. 1, § 249, as a question still undecided, and the author concludes:

"Where, however, the market price of property has been enhanced by such an operation, it will be regarded as the value of the property, at least when the question arises between parties neither of whom has been concerned in the raising of the price. And since value is really measured by the opinion of the public, and that opinion, when expressed in a free market, is the market value, it would seem that, if even for a short time buyers and sellers, unconstrained to act, are willing to pay and to receive a certain price for the commodity, this price is its value, but what one when *constrained* to buy must pay is not necessarily the value."

The author and the causes cited deal with instances where prices have been artificially advanced by manipulators for the purpose of increasing profit. The evidence discloses no such fact in the instant case. Scarcity of supply and increased demand, resulting from war and labor conditions, cannot be said to constitute artificial enhancement. The effect of the Lever Act was not to increase, but to reduce, prices. There is a distinction between a market controlled by unlawful combination and manipulation, and one that is high and irregular, due to disturbed conditions at home and abroad. The former is the result of activities which were unlawful, and no doubt the same public policy which condemns the conspiracy to control the price rejects the result as a rule of evidence, when offered on behalf of a member of the combination. The latter is the result of circumstances not within control of either purchasers or sellers.

The government calls attention to the language in the opinion of the court in New York v. Sage, 239 U. S. 57, 61, 36 Sup. Ct. 25, 60 L. Ed. 143, where it is stated that—

"What the owner is entitled to is the value of the property taken, and that means what it may fairly be believed that a purchaser in fair market conditions would have given for it in fact—not what a tribunal at a later date may think a purchaser would have been wise to give, nor a proportion of the advance due to its union with other lots."

The question under consideration was whether the commissioners, in fixing compensation for property appropriated by the city for reservoir purposes, were justified in adding to the sum allowed for the land and building a further amount "for reservoir availability and adaptability." No question as to the general condition of the real estate market was before the court. The court found that the commissioners had considered the value of the reservoir as a whole and allowed a fair proportion of the increase over and above the market value of the lot. It was held that adaptability for the purposes for which the land could most profitably be used might be considered, but only so far as the public would have considered it if the land had been offered for sale in the absence of the city's exercise of the power of eminent domain; also that the city was not to be made to pay for any part of what it had added to the land by uniting it with the lots, if that union would not have been practicable or have been attempted, except by the intervention of eminent domain. The fair market conditions there referred to seem to have been those conditions of availability of the land itself and the title thereto which would have affected its sale to one of the public, as distinguished from those conditions supplied by the city by the very exercise of the right of eminent domain. If, in the instant case, the plaintiff sought to trade upon the necessity of the navy for fuel, and so enhance the price, the case would be directly in point. But it is not so. The plaintiff asks the same price that it received from others in the general market, and not more, but less, than the prevailing market price. There is no evidence to show that the market was affected by the navy's requirements. It took less than 1,500,000 out of some 35,000,000 of tons produced in the smokeless coal region during the year 1920.

The same consideration shows those cases to be not here pertinent which hold that value to the party taking is not the test, and that enhancement of the price by reason of the obligation of the government to take the property should not be considered in determining a fair price. U. S. v. Chandler-Dunbar Co., 229 U. S. 53–77, 33 Sup. Ct. 667, 57 L. Ed. 1063; McGovern v. New York, 229 U. S. 363, 33 Sup. Ct. 876, 57 L. Ed. 1228, 46 L. R. A. (N. S.) 391; United States v. Seufert Bros. Co. (C. C.) 78 Fed. 520; Sargent v. Merrimac, 196 Mass. 171, 81 N. E. 970, 11 L. R. A. (N. S.) 996, 124 Am. St. Rep. 528; Burger v. State Female Normal School, 114 Va. 491, 77 S. E. 489. It is said that the market was not a fair market. The term "fair market value" does not mean value in a fair market, in the sense of a market in which the supply about equals the demand, and in which conditions might be termed fairly normal, but means fair worth in view of existing market conditions.

[2, 3] The government cites cases to show that compulsory sales and purchases are not indicative of true market value and that proposi-

tion is undoubted. Lanquist v. Chicago, 200 Ill. 69, 65 N. E. 681; Brown v. Calumet River Ry. Co., 125 Ill. 600, 18 N. E. 283. But the evidence here is not of that character. The market value of plaintiff's coal is established by the range of prices that obtained throughout the entire seven months in question at Hampton Roads and at Baltimore, Philadelphia, New York, Boston and Columbus, for coal of this grade, f. o. b. mines. The market so established is too broad to come within the rule excluding extraordinary, unusual and forced sales. .

Suppose this coal had been requisitioned, not from the producers or the producers' selling representatives, but from those who had purchased the same upon the open market, as, for instance, retail dealers, operators of coal yards, or the like; would it be said that the measure of just compensation was the cost of production plus a reasonable profit? Or, on the other hand, cost to the dealer from whom it was taken plus a reasonable profit? Assuming part were requisitioned from the producer, and part from the retail dealer, would they be allowed different rates of compensation? Is the compensation to be determined by who receives it? Just compensation is for the property, not to the owner. Mr. Justice Brewer in Monongahela Navigation Co. v. United States, 148 U. S. 312, 326, 13 Sup. Ct. 622, 37 L. Ed. 463. It is obviously impossible to depart from the rule of market value with regard to marketable commodities. Value is compensation; money for money's worth. Any other rule would lead to inequality and confusion.

In United States v. Russell, 13 Wall. 623, 20 L. Ed. 474, it was held that where the government, in emergencies, takes private property into its use, a contract to reimburse the owner is implied, and that the government is bound to make "full compensation" to the owner. The meaning of the phrase "just compensation," as used in the Fifth Amendment, is discussed by Mr. Justice Brewer in Monongahela Navigation Co. v. United States, supra:

"The noun 'compensation,' standing by itself, carries the idea of an equivalent. * * * And this is made emphatic by the adjective 'just.' There can, in view of the combination of those two words, be no doubt that the compensation must be a full and perfect equivalent for the property taken."

The compensation must, of course, be just to the public as well as to the owner. Searl v. School District, 133 U. S. 553, 562, 10 Sup. Ct. 374, 33 L. Ed. 740; Bauman v. Ross, 167 U. S. 548, 17 Sup. Ct. 966, 42 L. Ed. 270.

[4] How can there be a full and just equivalent, unless the plaintiff receives from the government as much as it might have received from others in the open market for this coal? Cost plus a reasonable profit may be more or less than an equivalent for an article seized, depending upon the state of the market. It is not a dependable rule, but one to which recourse has been had only as a dernier ressort in cases where the rule of market value was impossible of just application.

It is therefore concluded that neither the then existing legal regulations, nor the unusual disparity between supply and demand, nor both together, produced a condition which the court is warranted in pronouncing "no market." The price of $5.60 per gross ton which the plaintiff asks for the coal does not exceed its fair value, in contempla-

tion of the available market and the prevailing market prices at the time the government requisitioned it, and therefore the obligation of the government to pay just compensation requires that judgment be awarded the plaintiff for that sum less $3 per ton heretofore paid on account.