## NATIONAL CITY BANK OF NEW YORK v. UNITED STATES.

(District Court, S. D. New York. March 8, 1921.)

1. War ⨠14—Plaintiff bank held "person entitled to receive" compensation under Lever Act.

Where bank paid for coffee on account of a Russian company, its payment therefor resulting in an overdraft by the company of $94,000, secured by a lien on the coffee, and the coffee was later commandeered under Lever Act, § 10 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115⅛ii), and the government paid 75 per cent. of the award therefor, or $313,000, to the bank, thus wiping out the overdraft, the bank, holding the legal title to the coffee under General Business Law N. Y., § 125, by virtue of negotiable warehouse receipts issued to it, was entitled to sue the government for the balance of the compensation due under the Lever Act, as the "person entitled to receive" such compensation as trustee for its principal the Russian company; such right not being affected by the fact that

---

⨠For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

neither the bank nor the company were licensed under proclamation of the President of January 30, 1918, as neither the bank nor the company were engaged in importing or exporting or distributing coffee in this country, nor by the further fact that part of the coffee was sold by the company in Russia, there being no showing that the vendees there acquired title.

2. **Eminent domain** ⊂⊃69—War power does not abrogate constitutional guaranties of Fifth Amendment.

Const. art. 1, § 8, cl. 11, conferring on Congress power to declare war, does not abrogate the constitutional guaranty contained in the Fifth Amendment.

3. **Constitutional law** ⊂⊃54, 79—Fixing compensation for property taken for public use is judicial question.

The executive officers of the government have no power to fix compensation for property taken by the government, nor can the Congress determine by statute what is just compensation; but the question is judicial, and can be determined only by the courts.

4. **Eminent domain** ⊂⊃131—"Just compensation" is fair market value.

The just compensation guaranteed by the Constitution is the fair market value of the property taken, and the market must be a free market, as prices prevailing in a market not free are not the measure of compensation.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Just Compensation.]

5. **War** ⊂⊃14—"Just compensation," under Lever Act, is free market value.

"Just compensation" for property taken under Lever Act, § 10 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115⅛ii), is the free market value thereof, not cost plus 5 per cent.; the governmental power to fix prices in ordinary trading or commercial transactions not authorizing the government itself to acquire property in invitum at such reduced prices.

At Law. Action by the National City Bank of New York against the United States. Judgment for plaintiff.

Shearman & Sterling, of New York City (Carl A. Mead and Philip A. Carroll, both of New York City, of counsel), for plaintiff.

Francis G. Caffey, U. S. Atty., of New York City (Earl B. Barnes, Asst. U. S. Atty., and Theodor Megaarden, Sp. Asst. U. S. Atty., both of New York City, of counsel), for the United States.

MAYER, District Judge. This case is brought under section 10 of the so-called Lever Act (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115⅛ii) to recover such sum as, added to 75 per cent. of the award made by the President, will constitute "just compensation" for 20,000 bags of Santos and Guatemala coffee commandeered by the Navy Department in November, 1918. For the purpose of this proceeding it is agreed that the coffee weighed 2,737,064 pounds, and consisted one-half of Santos and one-half of washed Guatemala of certain grades.

Section 10 of the act, supra, provided:

"That the President is authorized, from time to time, to requisition foods, feeds, fuels, and other supplies necessary to the support of the army or the maintenance of the navy, or any other public use connected with the common defense, and to requisition, or otherwise provide, storage facilities for such supplies; and he shall ascertain and pay a just compensation therefor. If the compensation so determined be not satisfactory to the person entitled to receive the same, such person shall be paid seventy-five per centum of the amount so determined by the President, and shall be entitled to sue the

⊂⊃For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

United States to recover such further sum as, added to said seventy-five per centum will make up such amount as will be just compensation for such necessaries or storage space, and jurisdiction is hereby conferred on the United States District Courts to hear and determine all such controversies. * * * "

The two main questions here presented are: (1) Whether plaintiff can maintain this action as "the person entitled to receive" compensation; and (2) what is "just compensation"?

[1] 1. The coffee here concerned was imported by coffee dealers at various dates, but in any event all was imported prior to January 18, 1918. On that date the coffee was brought on a cable order from North Oceanic Steamship & Trading Company, a Russian corporation located at Archangel (hereinafter called the Russian Company) to Francisconi & Co., a New York firm. The coffee was purchased for export to Northern Russia, where there was great need of foodstuffs. Plaintiff (hereinafter called the Bank) paid for this coffee under a letter of credit in favor of Francisconi & Co. and Hard & Rand, coffee dealers, for account of the Russian corporation. These payments resulted in an overdraft, which on November 21, 1918, amounted to $13,324.60, and on July 5, 1919, amounted, according to the Bank's figures, to $94,312.42. The overdrafts were secured by a lien upon the coffee, and the warehouse receipts for the coffee were taken in the Bank's name.

On November 21, 1918, the navy commandeered the coffee. On February 17, 1919, the government awarded the sum of $423,536.69 at the price of 15.29 cents per pound f. o. b. warehouse as compensation for the coffee. On July 5, 1919, the Bank notified the government that the award was not satisfactory. The government on August 26, 1919, paid 75 per cent thereof—i. e., $313,356.77—to the bank; the debit balance in favor of the Bank being at that time $94,763.61. This debit balance was wiped out by the payment aforesaid, and on September 19, 1919, when this action was commenced, there was nothing due the bank.

At the outset, it may be stated that the evidence clearly leads to the conclusion that the coffee was seized and that the award was made under the so-called Lever Act, and not under other provisions of law. At the time when the coffee was purchased by the Russian Company, the provisions of the Lever Act and the rules and regulations of the United States Food Administration had not been extended to coffee. On January 30, 1918, however, the President placed green coffee on the conservation list by a proclamation which read in part as follows (40 Stat. pt. 2, p. 1742):

"All persons, firms, corporations, and associations engaged in the business of importing or distributing green coffee are hereby required to procure a license on or before February 4, 1918."

Clearly the Bank was not then engaged in the business either of importing or distributing coffee, and neither the proclamation nor the rules applied to it, and the Russian Company was not then engaged in the business of importing coffee. But it is claimed that the Russian Company was engaged in the business of distributing. The coffee was purchased for export, and, had it been attempted to export the same,

there was a regulation made in March, 1918, which required a license to export green coffee.

No attempt was ever made either by the Bank or the Russian Company to distribute the coffee here. The Bolsheviki had cut off Archangel from the rest of Russia in April, 1918, and the Allies did not drive them out until August, 1918. Later, under the Tchajkowsky government, one Danischewski, who was the managing director of the Russian Company, became a member of the Supply Committee of the Northern Region government, whose object was to supply Northern Russia with all kinds of food. He then sought to send the coffee and other food supplies to Archangel.

The coffee was intended for the use of the Northern District, under the control of the Archangel government. A large part of it was sold to the Northern Region Supply Company, which was organized by and under the control of that government. Danischewski was not in the United States between February and December, 1918. He was sent to the United States by the Supply Committee of the Northern Region Government, but he did not arrive here until March, 1919. Until his arrival here he had no knowledge of the American regulations in regard to dealing in coffee. He never made any contract to sell the coffee in America, and made no effort to do so until after he had heard that it had been commandeered by the government. The futile efforts of the Russian Company, per Danischewski, to supply coffee in Northern Russia, took the form of sales made there, and not here, in June, July, and September, 1918.

The proclamation of the President, supra, and the rules made thereunder, cannot be strained to cover attempted distribution in Russia by sales made in Russia, when there was no exporting, and hence no need for a license to export, and when the Russian Company was neither engaged in importing coffee here nor distributing it here. This disposes, inter alia, of the contention that the Bank or the Russian Company was hoarding, contrary to rule 5, because that rule applied only to licensees, and neither the Bank nor the Russian Company was required to be a licensee under the President's proclamation.

It thus appears that on November 21, 1918, when the Navy Board commandeered this coffee, as it had the right to do, the Bank had the legal title to the coffee, and had its lien thereon, and was holding the coffee lawfully, and that the Russian Company's beneficial interest was lawfully held. At any time up to August 26, 1919, when the government paid 75 per cent. of the award, the Bank was clearly the "person entitled to receive compensation," and was so recognized by the government. When the Bank received that compensation, it became a trustee to pay over to the rightful owners the balance after retaining the amount due it. But its duty did not end there.

The warehouse receipts had all issued to the order of the Bank and were negotiable; hence they gave to the Bank the legal title to the coffee. New York General Business Law (Consol. Laws, c. 20) § 125. This section, which is a provision of the Uniform Warehouse Law, contains the following:

"A person to whom a negotiable receipt has been duly negotiated acquires thereby:

"(a) Such title to the goods as the person negotiating the receipt to him had or had ability to convey to a purchaser in good faith for value, and also such title to the goods as the depositor or person to whose order the goods were to be delivered by the terms of the receipt had or had ability to convey to a purchaser in good faith for value."

In this case, the Bank itself, acting, however, for account of the owners, was the depositor of the goods. Its act in depositing the goods in the warehouse was the act of the owners, who were, accordingly, under the provision of this section, the depositors of the coffee and had full power to convey the title to it. The Bank, under this section, had, by virtue of holding the negotiable warehouse receipts, the title to the coffee, in trust, however, for the owners.

The Bank still held the legal title after its advances had been paid, by virtue of the negotiable warehouse receipts; and it was still a trustee, and, as such, entitled to maintain the action. As trustee it could not stand by and see the property of its principals taken, even by authority of law, and yet make no effort to enforce the remedy accorded by the Lever Act to it as the "person entitled to receive the compensation." Indeed, the attitude of the Bank has been commendable, and has evidenced appreciation of its duty; for the owners were in Russia, and in all the circumstances were unable to protect their rights.

It is plain that the owners, by their course of conduct, had made the Bank their trustee, and that the Bank still remains the trustee, and the government need have no fear that it will be subjected to a double recovery. The attempted sales in Russia in no manner changed the legal status of the Bank, and, for that matter, the legal effect of those sales is not disclosed by the evidence, and whether or not the vendees have title, as we understand that term, has obviously not been shown. It is held, therefore, that the Bank is the proper claimant or party plaintiff.

[2] 2. The Fifth Amendment to the Constitution of the United States provides that private property shall not be taken for public use without just compensation. Article 1, § 8, cl. 11, of the Constitution of the United States confers upon the Congress power to declare war. This war power, however, does not abrogate the constitutional guaranty contained in the Fifth Amendment, as has been recently reiterated by the Supreme Court in the Lever Act cases.

[3] The executive officers of the government have no power to fix compensation, nor can the Congress determine by statute what is just compensation. The question is judicial and can be determined only by the courts. Cooley, Constitutional Limitations (7th Ed.) 817; Matter of City of Buffalo, 139 N. Y. 422, 430–431, 34 N. E. 1103; Charles River Bridge v. Warren Bridge, 11 Pet. 420, 571, 9 L. Ed. 773; Monongahela Navigation Co. v. U. S., 148 U. S. 312, 13 Sup. Ct. 622, 37 L. Ed. 463.

[4] It is the rule of law in condemnation cases that the just compensation guaranteed by the Constitution is the fair market value of the property taken. Lewis on Eminent Domain (2d Ed.) § 706, p. 1048;

Kerr v. South Park Commissioners, 117 U. S. 379, 6 Sup. Ct. 801, 29 L. Ed. 924; Shoemaker v. United States, 147 U. S. 282, 13 Sup. Ct. 361, 37 L. Ed. 170; McGovern v. N. Y., 229 U. S. 363, 33 Sup. Ct. 876, 57 L. Ed. 1228, 46 L. R. A. (N. S.) 391; N. Y. v. Sage, 239 U. S. 57,[1] U. S. v. Chandler-Dunbar Co., 229 U. S. 57, 33 Sup. Ct. 667, 57 L. Ed. 1063. The Chandler-Dunbar Case is a helpful illustration of the principle because the rule was applied in order to prevent the owner from recovering more than the fair market value. There it was contended that the parcel taken possessed "strategic value" with reference to a general scheme of water-front development, such as that for which the property was taken. The court, in disallowing this item of value, said (Mr. Justice Lurton, at 229 U. S. 81, 33 Sup. Ct. 679, 57 L. Ed. 1063):

"The owner must be compensated for what is taken from him, but that is done when he is paid its fair market value for all available uses and purposes."

Not only is market value the measure of just compensation, but it must be the value in a free market. Prices prevailing in a market which is not free are not the measure of just compensation. Muser v. Magone, 155 U. S. 240, 15 Sup. Ct. 77, 39 L. Ed. 135; Lawrence v. Boston, 119 Mass. 126; Lovejoy v. Michels, 88 Mich. 15, 49 N. W. 901, 13 L. R. A. 770.

It is well settled that a person whose property is taken is entitled to its market value for the most valuable use, although as matter of fact he did not devote it to that use, and for some reason or other could not do so. In such case, however, he would be free to sell it to a person who could so use it. Matter of Gilroy, 85 Hun. 424–427, 32 N. Y. Supp. 891; Boom Co. v. Patterson, 98 U. S. 403, 409, 25 L. Ed. 206; Goodin v. Cincinnati, etc., Canal Co., 18 Ohio St. 169, 181, 98 Am. Dec. 95; Little Rock Junction Ry. Co. v. Woodruff, 49 Ark. 381–393, 5 S. W. 792, 4 Am. St. Rep. 51; San Diego, etc., Co. v. Neale, 78 Cal. 63, 68, 73, 20 Pac. 372, 3 L. R. A. 83.

[5] Under these decisions it is clear that the provisions of the Lever Act and of the regulations thereunder, attempting to limit the powers of the owner of property, cannot be considered in this proceeding as affecting the value of the property. The government, as a war measure under the exercise of governmental powers, may fix prices, either directly or by governmental regulations necessarily reducing the prices; but this does not authorize it to acquire the property in invitum at such reduced prices. Los Angeles v. Los Angeles Gas Corporations, 251 U. S. 32, 40 Sup. Ct. 76, 64 L. Ed. 121.

The preamble of the Lever Act provided:

"That by reason of the existence of a state of war, it is essential to the national security and defense, for the successful prosecution of the war, and for the support and maintenance of the army and navy, to assure an adequate supply and equitable distribution, and to facilitate the movement, of foods, * * * hereafter in the act called necessaries; to prevent, locally or generally, scarcity, monopolization, boarding, injurious speculation, manipulations, and private controls, affecting such supply, distribution and movement; and to establsh and maintain governmental control of such necessaries during the war. * * * The President is authorized to make such regulations and to

[1] 36 Sup. Ct. 25, 60 L. Ed. 143.

issue such orders as are essential effectively to carry out the provisions of this act."

To carry out the purposes of the act, the President could make regulations in the way, inter alia, of fixing prices in ordinary trading or commercial transactions; but when the United States itself took foods —i. e., property—it was bound to award just compensation, and what is just compensation under the Constitution is determined by the same legal principles in war as in peace. Adopting the principles stated supra, the testimony shows clearly that there was a free market; not, it is true, a large or comprehensive market, but nevertheless a substantial trading sufficient to characterize a free market.

The Bank produced experienced coffee men, probably the best informed in this trade in respect of the prices of the coffee here under consideration. It is unnecessary to review their testimony in detail, because the data are clearly established. To award only cost plus 5 per cent. profit, as contended by the government, would not be just compensation, constitutionally considered. In all litigations like this, principle must never be departed from. In the long run, the Constitution remains a safe guide, although worthy sentimental considerations, at times, offer temptations to go astray.

The prices, as matter of law, must be ascertained as of the free market of November, 1918. The exact figure to a cent is difficult of ascertainment; but, on the evidence, the market value of the coffee is found to be as follows: Santos, averaging prime, 20 cents; washed Guatemala, averaging prime, 20½ cents. Counsel will make the necessary calculations to work out the exact figures, and judgment will be ordered accordingly.

Submit on five days' notice.