### FORD v. UNITED STATES. *

### MATTHEW ADDY CO. v. SAME.

(Circuit Court of Appeals, Sixth Circuit. May 4, 1922.)

#### Nos. 3516, 3517.

1. **War** ⬅4—**Regulation fixing profit of coal jobbers held to apply to all sales made thereafter.**

Regulation promulgated by the President August 23, 1917, pursuant to Lever Act Aug. 10, 1917, § 25 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115⅛q), prohibiting jobbers for the buying and selling of bituminous coal, from adding to the purchase price a gross margin in excess of 15 cents per ton, *held* to apply to all sales made thereafter, though the coal may have been purchased before the passage of the act.

2. **War** ⬅4—**Emergency order of President fixing charges of coal jobbers held valid.**

The Emergency regulation issued by the President August 23, 1917, under Lever Act Aug. 10, 1917, § 25 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115⅛q), fixing the gross margin to be charged by coal jobbers pending investigation and action by the Trade Commission, *held* not

---

⬅For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

*Certiorari granted 258 U. S. ——, 43 Sup. Ct. ——, 67 L. Ed. ——.

in excess of his authority, because in a particular case it gave a jobber inadequate compensation or even caused it a loss.

**3. War �köä4—Authority of President to delegate power to regulate coal traffic permissive only.**

In Lever Act Aug. 10, 1917, § 25 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115⅛q), which vested the President with broad powers during the war to regulate the production, sale, and price of coal, and provided that "said authority and power may be exercised by him in each case through the agency of the Federal Trade Commission during the war, or for such part of said time as in his judgment may be necessary," the word "may" is permissive only, and the provision did not abridge the power of the President to act directly.

**4. Constitutional law �köä298(1)—War �köä4—Provision of Lever Act authorizing fixing of coal prices held constitutional.**

Lever Act Aug. 10, 1917, § 25 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115⅛q), authorizing the fixing of prices for coal by executive order, *held* not unconstitutional, as depriving coal owners of their property without due process of law, but within the war powers vested in Congress by Const. art. 1, § 8.

**5 Constitutional law ⊙ä62—Lever Act, authorizing regulation of coal production and prices, held not unconstitutional delegation of legislative power.**

Lever Act Aug. 10, 1918, § 25 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115⅛q), authorizing the President to regulate the production and prices of coal, *held* not unconstitutional as a delegation of legislative power.

In Error to the District Court of the United States for the Southern District of Ohio; John W. Peck, Judge.

Criminal prosecutions by the United States against Benjamin N. Ford and against the Matthew Addy Company. Judgments of conviction, and defendants bring error. Affirmed.

For opinion below, see 263 Fed. 449. See, also, 265 Fed. 424.

Joseph S. Graydon and Julius R. Samuels, both of Cincinnati, Ohio, for plaintiff in error Ford.

Joseph S. Graydon and Julius R. Samuels, both of Cincinnati, Ohio (Lawrence Maxwell and Nelson B. Cramer, both of Cincinnati, Ohio, on the brief), for plaintiff in error Matthew Addy Co.

Thomas H. Morrow, Asst. U. S. Atty., of Cincinnati, Ohio (James R. Clark, U. S. Atty., and Allen C. Roudebush, Asst. U. S. Atty., both of Cincinnati, Ohio, on the brief), for the United States.

Before KNAPPEN, DENISON, and DONAHUE, Circuit Judges.

KNAPPEN, Circuit Judge. The Lever Act was approved and took effect August 10, 1917. 40 Stat. c. 53, p. 276 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, §§ 3115⅛e–3115⅛kk, 3115⅛*l*–3115⅛r). Its title declares it—

"an act to provide further for the national security and defense by encouraging the production, conserving the supply and controlling the distribution of food products and fuel."

By section 25 (section 3115⅛q) the President of the United States was authorized and empowered—

"whenever and wherever in his judgment necessary for the efficient prosecution of the war, to fix the price of coal and coke, wherever and whenever

sold, either by producer or dealer, to establish rules for the regulation of and to regulate the method of production, sale, shipment, distribution, apportionment, and storage thereof among dealers and consumers, domestic or foreign," etc.

Subdivision 17 of that section penalizes the violation of or refusal to conform to the regulations provided for in the section, with knowledge that they have been so prescribed. On August 23, 1917, the President adopted a series of regulations as to prices and margins to be in force "pending further investigation or determination thereof by the President." The first of these regulations defined a coal jobber as a person (or other agency) "who purchases and resells coal to coal dealers or to consumers without physically handling it on, over, or through his own vehicle, dock, trestle or yard." Regulation No. 2 forbids a jobber, for the buying and selling of bituminous coal, to add to his purchase price a gross margin in excess of 15 cents per ton. Paragraph 16 of section 25 provides that the maximum price fixed and published (by the Trade Commission) shall not be construed as invalidating any contract in which prices are fixed, made in good faith, prior to the establishment and publication of maximum prices by the commission; and on October 6, 1917, the Fuel Administrator made a regulation that bona fide contracts relating to bituminous coal, made before the President's proclamation of August 21, 1917, should not be affected "by these proclamations."

It is conceded or established by verdict that the Matthew Addy Company was, at the time of the transactions complained of, a corporation conducting at Cincinnati, Ohio, the business of a coal jobber, as defined in the President's regulation; that Benjamin N. Ford was vice president, and in such capacity had control and direction of the activities and contracts of the Matthew Addy Company, so far as they related to the conduct of the business as a coal jobber; and that each plaintiff in error knew of the regulation fixing the "gross margin" at 15 cents per ton. The corporation (cause No. 3517) and Ford (No. 3516) were separately indicted for making, subsequent to August 23, 1917, various specific sales of coal at a price which "included a profit or gross margin" to the corporation of 25 cents per ton; the corporation having no contract with the purchaser made in good faith prior to August 23, 1917, and with knowledge on the part of the respective defendants that such "profit or gross margin of 25 cents per ton" was in excess of the "profit or gross margin of 15 cents per ton" permitted, by the executive order and regulations referred to, to be added to the purchase price paid by the jobber. The corporation was convicted upon 13 counts of the indictment against it; Ford was convicted upon 7 counts of the indictment against him. In the case of each count in each indictment on which conviction was had it was either admitted or established that the sales were made at a gross margin of 25 cents in excess of the purchase price to the jobber, and that on August 23, 1917, the corporation had no contract for the sales in question. It appeared, however, that all the coal covered by the various counts had been purchased by the corporation previous to August 10, 1917, when the Lever Act took effect. The two cases were tried together, and were

argued together in this court. In each the questions presented for review are the same.

[1] 1. Plaintiffs in error contend that inasmuch as the coal in question was bought prior to the President's order of August 23d and the passage of the Lever Act (August 10th), and as the executive order allowed a margin of 15 cents per ton for the combined "buying and selling of bituminous coal," the penal provisions of section 25 do not apply; that on August 21st the President had provisionally fixed prices of coal both at the mines and in the hands of middlemen and retailers, based upon the cost of production, and regarded as not only just, but fair and liberal; that the buying and selling amounted to a single transaction, and that to so construe the act as to cover a purchase previous to the executive order and the act would be contrary to the intent of the regulations, and would in given cases attribute to the President an intention to limit the jobber to a gross margin which might well be less than the expense incurred by him in the purchase thereof. This conclusion is thought to be confirmed by certain rulings in the Fuel Administrator's order of October 6, 1917, which are thought to indicate that it was not at that subsequent date considered an offense for a jobber who had purchased coal prior to August 23d to sell it at any price obtainable. Plaintiffs in error invoke the proposition that penal laws are to be strictly construed, and should not be regarded retroactive unless such intention is clear.

It seems plain that the President's order of August 23d should not be construed as excluding from its operation coal previously bought. Neither the statute nor the regulations were ordinary legislation. That they were designed to meet a real emergency is shown, not only by the title of the act, but by the preamble, which asserts that the measures provided thereby for conserving the supply of food products, fuel, etc., the establishment of government control, and the issue of regulations and orders provided for, were by reason of the existence of a state of war essential to the national security and defense, for the successful prosecution of the war, and for the maintenance of the army and navy. The act was in terms made effective only until the end of the then existing war. Even ordinary remedial laws, although penal, are not to be so strictly construed as to defeat the obvious legislative intent. Johnson v. So. Pacific R. R. Co., 196 U. S. 1, 17–18, 25 Sup. Ct. 158, 49 L. Ed. 363.

We think the sole inquiry in this connection relates to the intent of the executive in making the order of August 23d. The order must, we think, be construed as applying to *all sales* made subsequent to the order, regardless of the time the purchases were made. No limitation in this respect was placed by the statute upon executive action. The authority given was to fix prices of coal wherever and whenever sold. The order of August 21st followed but 10 days after the passage of the statute. It stated that it should be in force pending further investigation. As stated by the trial judge, it was matter of public knowledge, and recognized in certain orders of the fuel administration, that the coal mine output was largely contracted to be sold in advance; that the supply of coal was to a large extent, and in a proper sense, in

the hands of jobbers, when the act was passed; and that unless jobbers' margins with reference to then existing contracts of purchase were regulated it remained open to jobbers to demand what they could get for their coal, and thus carry on the injurious manipulation and private control of the supply which the act was designed to prevent. We have no difficulty in agreeing with the trial judge that the President's orders in question make clear an intention to control and prevent speculation in fuel so far as possible, and not to permit jobbers who already held contracts for mine output to be free from restriction in the disposition of the same.

[2] 2. Plaintiffs in error complain that they were not allowed to show that 15 cents per ton added as commission or gross margin to its purchase price results in this case to loss or inadequate compensation. Denial is made of the President's authority to so limit the gross margin as to accomplish that result. In this connection there is a suggestion that the President's authority can only be exercised through the Federal Trade Commission, a subject which will later be considered under another heading. It is further urged that, even if the immediate emergency justified the President in fixing jobber's prices, he was subject to the limitations imposed by the act upon the Trade Commission, which (under paragraph 14) was required in fixing maximum producers' prices to "allow the cost of production, including the expense of operation, maintenance, depreciation, and depletion," plus "a just and reasonable profit"; paragraph 15 further providing that—

"in fixing such prices for dealers, the Commission shall allow the cost of the dealer and shall add thereto a just and reasonable sum for his profit in the transaction."

In our opinion this contention overlooks the summary nature of the power which we think was conferred on the President, to meet the emergency by making temporary orders which should, so far as possible, save the immediate situation until the commission should have time and opportunity, through its slower processes, to make more complete investigation of conditions and remedies. It should be conclusively presumed that the President gave the subject all the investigation and consideration which the emergency permitted. It was thus not open to plaintiffs in error to show that in their specific cases the margin allowed was inadequate or resulted in loss.

[3] 3. By motion to quash the indictment it is urged that by the Lever Act the President was given no power to fix prices at which coal could be sold, but that such power rested solely in the Trade Commission. Following the broad powers given the President by paragraph 1 of section 25, as quoted in part at the beginning of this opinion, is this express provision:

"Said authority and power *may*[1] be exercised by him in each case through the agency of the Federal Trade Commission during the war, or for such part of said time as in his judgment may be necessary."

Plaintiffs in error contend that the word "may" must be construed as "shall," and that this is shown by the asserted "startling innovation

[1] Italics ours.

in legislative action," due to the exigencies of the war, found in the authority given the President to fix prices of coal and coke and to establish rules and regulations, etc., as contained in the earlier part of the act, as well as in the provisions relating to compensation for the use of plants and businesses requisitioned, to the designation by the President of an agency to which the producers shall sell their products, etc., to procedure by the Trade Commission in inquiring into the cost of producing coal and coke, and in the requirement that the Commission, in fixing maximum prices, shall allow the cost of production or service and add thereto a just and reasonable sum for the profit in the transaction.

We are unable to agree with this contention. The District Judge, in a brief but comprehensive opinion (263 Fed. 451), held that the word "may" is merely permissive; that the President was by the first paragraph of the section empowered, not required, to exercise his authority through the Commission in each instance; and that such intention was otherwise clear from the context. In this opinion we fully concur.

Nor do we think there was error in refusing defendants' request to charge that defendants were not liable unless the 25 cents per ton, added by them to the purchase price of $3.25 per ton, included a profit (after the deduction of all costs and expenses) in excess of 15 cents per ton, and in charging that "profit" means the same as "gross margin," viz. the difference between the purchase price and the selling price.

[4, 5] 4. The constitutionality of section 25 of the act is vigorously assailed on several grounds; the first being that it deprives plaintiffs in error of their property without due process of law. The specific criticisms are that the law is not clear and definite, and that no notice and hearing upon the making of executive orders is provided for. The first criticism is plainly without merit. Nothing could well be more clear and definite than the plain inhibition against making the selling price more than 15 cents per ton higher than the purchase price. The case is obviously not within the reasoning of the Cohen Case, 255 U. S. 81, 89, 41 Sup. Ct. 298, 65 L. Ed. 516, 14 A. L. R. 1045, which held section 4 of the act (section 3115⅛ff) invalid; and the instant case is not affected by that decision.

As to the second criticism: While under ordinary conditions notice and hearing would be conditions precedent to the making of an order of this kind, we agree with the court below (265 Fed. 424) that due process of law is not to be tested by form of procedure merely, that public danger warrants the substitution of executive processes for judicial process (Moyer v. Peabody, 212 U. S. 78, 84, 29 Sup. Ct. 235, 53 L. Ed. 410), and that under the war conditions then existing, and as indicated by the preamble of the act, the fixing of prices in industries so vital to the prosecution of the war as food and fuel was not the deprivation of due process of law, but is within the power given to Congress by article 1, § 8, of the Constitution, to make all laws necessary and proper for carrying into execution the war powers expressly enumerated.

Our conclusion that section 25 of the Lever Act is valid is confirmed by the many recent decisions of the Supreme Court sustaining the ex-

ercise of war powers; as in the McKinley Case, 249 U. S. 397, 398, 39 Sup. Ct. 324, 63 L. Ed. 668, where was sustained a regulation of the Secretary of War, made under the authority of Congress, forbidding the keeping of houses of ill fame within a certain distance of military camps; the War-Time Prohibition Case, 251 U. S. 146, 160, 40 Sup. Ct. 106, 64 L. Ed. 194, holding that the exercise of the power to prohibit the liquor traffic as a means of increasing war efficiency was within the war power of Congress; Ruppert v. Caffey, 251 U. S. 264, 279, 283, 301, 40 Sup. Ct. 141, 64 L. Ed. 260, which sustained the prohibition against liquors containing one-half of 1 per cent. of alcohol, even though not in fact intoxicating; the Selective Draft Cases, 245 U. S. 366, 377, 38 Sup. Ct. 159, 62 L. Ed. 349, L. R. A. 1918C, 361, Ann. Cas. 1918B, 856; and the Espionage Cases of Schenck v. U. S., 249 U. S. 47, 39 Sup. Ct. 247, 63 L. Ed. 470; Frohwerk v. United States, 249 U. S. 204, 39 Sup. Ct. 249, 63 L. Ed. 561, and Debs v. United States, 249 U. S. 211, 39 Sup. Ct. 252, 63 L. Ed. 566. In several of the cases cited the Lever Act is referred to, and, to say the least, without apparent question of its validity generally.

The section is further criticized as violating articles 1, 2, and 3 of the federal Constitution, by attempting to delegate legislative and judicial powers to the President, the Fuel Administrator, and the Federal Trade Commission. We are unable to recognize any delegation of judicial power. In our opinion the delegation of power to make reasonable rules and regulations for the control of the food and fuel supply did not violate the prohibition against delegation of legislative power. Buttfield v. Stranahan, 192 U. S. 470, 494, 24 Sup. Ct. 349, 48 L. Ed. 525; Union Bridge Co. v. United States, 204 U. S. 364, 377, 27 Sup. Ct. 367, 51 L. Ed. 523; St. Louis, etc., Ry. Co. v. Taylor, 210 U. S. 281, 28 Sup. Ct. 616, 52 L. Ed. 1061; McKinley v. United States, supra.

We see no merit in the suggestion that the section is an abuse of the powers given Congress to provide for the national security and defense, or in the contention that the section violates the Tenth Amendment by interfering with the rights of the respective states as to regulation of industries within the states.

We have not discussed all the arguments adduced by counsel for plaintiffs in error in support of their contentions. We have, however, given them full consideration, and have reached the conclusion that no error was committed by the court below in the respects complained of, and that its judgment should be affirmed.