**NORFOLK & WESTERN RY. CO. v. FT. DEARBORN COAL & EXPORT CO.**

(Circuit Court of Appeals, Fourth Circuit. July 3, 1923.)

No. 2104.

1. **Evidence** ⬳323(2)—**Testimony as to market value of coal held properly excluded.**

In an action to recover for coal confiscated by a railroad company while in transit, a deposition containing a tabulated statement of the sales prices of coal at the mines over a large territory, compiled from hearsay information and covering only one-fourth of the mines in the territory, and which made no distinction between contract coal and spot coal, nor between coal sold for export and for domestic use, though there was a large difference in price at the time, *held* incompetent and properly excluded.

⬳For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

2. **Carriers** ⬤═⇒94(4)—**Market value at time of taking held measure of damages for confiscation of coal in transit.**

The measure of damages for confiscation of coal by a railroad company while in transit is the market value of the particular coal at the time and under the circumstances when it was taken.

3. **Carriers** ⬤═⇒94(4)—**Measure of damages for confiscation of coal in transit, includes enhanced price due to strike.**

Where coal confiscated by a railroad company was in transit to the seaboard for export, and for two months or more at that time, owing to a strike in the British coal mines, the price of export coal was considerably higher than for coal for the domestic market, the shipper is entitled to the benefit of such enhanced price.

4. **Carriers** ⬤═⇒156(2)—**Limitation of value in bill of lading relates to risk of carriage only.**

Limitations of value in an ordinary bill of lading have no relation to loss due to conversion of the property by the carrier.

In Error to the District Court of the United States for the Southern District of West Virginia, at Charleston; George W. McClintic, Judge.

Action at law by the Ft. Dearborn Coal & Export Company against the Norfolk & Western Railway Company. Judgment for plaintiff, and defendant brings error. Affirmed.

John H. Holt, of Huntington, W. Va. (Theodore W. Reath and F. Markoe Rivinus, both of Philadelphia, Pa., Waller R. Staples, of Roanoke, Va., and Holt, Duncan & Holt, of Huntington, Va., on the brief), for plaintiff in error.

George S. Couch, of Charleston, W. Va. (Harold A. Ritz and Brown, Jackson & Knight, all of Charleston, W. Va., on the brief), for defendant in error.

Before WOODS and WADDILL, Circuit Judges, and GRONER, District Judge.

GRONER, District Judge. This case is now before this court a second time. See 280 Fed. 264. The action was begun by the Coal Company to recover from the Railway Company the value of 897 tons of coal confiscated by the Railway Company at Bluefield, W. Va., in the months of July and August, 1920, while en route, over the lines of the Railway Company, to Lamberts Point, Hampton Roads, Va. We reversed on the former hearing because of the conclusion of the lower court that the plaintiff was entitled to a verdict for the cost price of the coal to it, without evidence of the market value of the same, and we there held the proper measure of damages, on the record as then before us, to be the value of the credit in the pool to which the coal was consigned.

On the second trial the plaintiff, in addition to proving the price paid by it for the coal, proved its market value, as of the date of the taking, in the pool at Lamberts Point, as well as its market value in the Kanawha coal fields in West Virginia, where it was loaded in the cars. The jury returned a verdict in favor of the plaintiff for the sum of $17,366.98, the cost price of the coal, with interest thereon from the date of confiscation, and on this verdict judgment was duly entered.

⬤═⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

The assignments of error on behalf of the Railway Company relate, first, to the refusal of the District Court to allow the defendant to read to the jury the deposition of one J. D. A. Morrow, vice president of the National Coal Association; second, to the action of the court in refusing to permit the defendant to read to the jury certain statistical tables relating to coal prices shown in the report of the committee on manufactures of the United States Senate, Sixty-Sixth Congress; and, third, the refusal of the court to grant certain instructions asked for by the defendant, and the granting of certain other instructions asked for by the plaintiff, and certain other specific objections to the charge of the court as given.

[1] We will dispose of these assignments in the order in which they are stated above. Morrow was vice president of the National Coal Association, an organization composed of operators, or producers of bituminous coal, in the states of Pennsylvania, Virginia, West Virginia, and Kentucky, with a membership of more than 2,000. The members of the association reported to him the cost of producing bituminous coal and the sales value thereof realized by them on board cars at the mines. From these reports he made up a tabulated statement covering the period from January 1 to October 1, 1920. There was no attempt in this report to segregate the prices obtained for contract coal and those obtained for spot coal, although it is well known in the business, and is amply shown in the evidence, that there may be, and frequently is, and at this particular time undoubtedly was, a marked difference in the prices received by the producer for the one and the other. It was also shown in the evidence that at the time of the confiscation of the coal in question there was in existence an English coal strike, which created, during the two or three months of the summer of 1920, an abnormal demand and price for export coal, and that there was a wide margin between the price for export coal and that for domestic coal; and there was, likewise, no attempt at segregation, in the tables, of the prices in these two markets. In addition to what has already been said, the compilation of reports embraced only 500 operators, out of more than 2,000, and there was no explanation of the failure to include reports from the other operators in preparing the tables. The information, too, upon which the tables were prepared, was wholly hearsay. For these reasons we are of opinion that the District Court was clearly right in refusing to admit the deposition.

[2] The report of the committee on manufactures of the United States Senate was also a statistical compilation of the cost of production and the selling price of coal, taken largely from the reports of the National Coal Association. It was, in many respects, identical with the Morrow report, and was subject to the same objection as to relevancy and materiality in the respects just hereinbefore mentioned as was the last named report. Its admission would not only have failed to aid the jury in arriving at a conclusion as to the market value of the coal at the time of the taking, but would have accomplished nothing else than the introduction of confusion and uncertainty into a subject susceptible of nearly exact ascertainment by the introduction of clear

and indisputable evidence. It was likewise, therefore, properly excluded.

The remaining assignments all relate, in one form or another, to the charge of the court as to the measure of damages. On this subject the court instructed the jury as follows:

"In arriving at the actual value of the plaintiff's coal taken, the jury must determine the fair value as between one who wishes to sell and one who wishes to purchase the same, and may take into consideration the whole range of prices asked by other persons wishing to sell, and paid by other persons wishing to buy for other coal of like grade at the same time and place, or at times and places so reasonably near thereto as to present practically similar conditions of coal trading."

To this statement of the law the Railway Company does not object, except that it insists that the court erred in not adding to the instruction, as it was insisted by the Railway Company should be done, the following additional words:

"But should not consider spasmodic speculative price or prices based upon abnormal necessities of the buyers."

To this the District Court, in explanation of its refusal so to include this language in the instruction, said to the jury as follows:

"It has been asked by the defendant that you should not consider spasmodic, speculative prices, or prices based upon abnormal necessities of the buyers. In explanation of my refusal to give that absolute instruction in that form, I will say that a one-day price, or a one-week price possibly, or the price of a man in such straits that his manufacturing plant would be shut down, and the loss that would be sustained by being shut down, is not a fair market price, and should not be considered as having very much weight in arriving at what a fair market price is. But when these prices run over a considerable period of time, so as to be in your opinion a fair market price for that period of time, it is a question for you to consider whether such prices could be called spasmodic or speculative, under the particular circumstances of this case."

[3] We regard this language of the court as correctly stating the law, and as applicable and in point in the circumstances shown by the evidence in the case. To have adopted the language urged by the Railway Company would have been to instruct the jury to ignore a market price extending over a period of nearly two months, created, it may be true, as the result of a strike in a foreign field, but neither spasmodic nor speculative in the sense that it was not real and existent at a time when the Coal Company might, legitimately, have availed of its advantages, except for the unlawful conversion of its coal. It is true the court also told the jury that the market value was based upon the value of the coal or credits which the Coal Company would have received in pools 5 and 7 at Lamberts Point, Va.; but the court also said, and the evidence amply justified the statement, that it was of no particular moment whether the price fixed as the market value was fixed as of the mines, or at Bluefield, the point of confiscation, or at Lamberts Point, the place of destination, for as to all three places the value of export coal, as testified by the witnesses, was substantially the same, and by admission of the parties the coal in question was clearly export coal, and was then, and at the time of confiscation, en

route to the seaboard, and, as was said by the Supreme Court in the case of United States v. New River Collieries, 43 Sup. Ct. 565, 67 L. Ed. —— (decided May 21, 1923):

"It could have been sold at the market price for export coal prevailing for spot deliveries at the time of the taking."

[4] Under these circumstances, the limitation fixed by the published tariff "on the basis of the value of the property at the time and place of shipment" is wholly inapplicable, even if the limitation there provided could be held binding; but we have heretofore held, in Dexter & Carpenter v. Davis, 281 Fed. 385, 388, that:

"Limitations of value in the ordinary bill of lading have no application to loss due to the conversion of the property by the carrier."

The only other exception which we think need be noticed is to that portion of the charge of the court which directed the jury to observe a distinction as to the market value between export coal and inland coal, and this we think is without merit, for, as has been already several times stated, the confiscated coal was so earmarked, from the moment of its purchase by the Coal Company and its delivery to the Railway Company, as export coal, as to put it in the one class and out of the other, and that there was a market for each, distinct and separate, was clearly shown by all the evidence. Precisely the same point was discussed at length by the Supreme Court in the New River Collieries Case, supra, and the conclusion here announced is in line with the decision of that court in that case. Indeed, the facts, and applicable principles in both cases are so nearly similar that the decision in this case may be rested upon the decision in that, without more.

Upon the whole case we are therefore of opinion that the judgment of the District Court should be, and it is, affirmed.