# George B. Newton Coal Co. v. Davis, Director General of Railroads, Operating Phila. & Reading Ry. et al., Appellant.

*Constitutional law—5th Amendment of Constitution of U. S.—Seizure of coal—Director general of railroads—Damages—Police power—War measures—War emergency—Threatened coal strike—Illegal extension of powers—Price-fixing—Food and fuel—Act of Congress of August 10, 1917, c. 53, 40 St. L. 276—Presidential order of Oct. 30, 1919—Parties—Admission—Act of Congress of February 28, 1920, c. 91, 41 St. L. 456.*

1. Aside from wartime regulations, one who seizes coal is bound to pay the owner as damages the market value of the coal converted.

2. Price-fixing under proper conditions, like rate-making, is exclusively a legislative matter, and, to sustain acts in relation thereto, an empowering statute must be pointed out; such legislation is sustained under the police power.

3. As yet it has not been determined that there exists in the government an unlimited right to fix prices for all commodities, including the necessities of life.

4. A state of war may affect with public interest articles which under normal conditions are free to commerce in its usual channels, and this renders them subject to governmental regulation.

5. Such regulation is based on what has been generally termed implied "war power."

6. When such power has been lawfully brought into action by Congress, it must be kept within its own limitations.

7. The power of the government to seize commodities and necessaries of life should not exist after the circumstances are ended which brought such power into life, namely, war or public insurrection actually existing.

8. Until the Supreme Court of the United States determines otherwise, the exercise of such power must be held ineffective after the cessation of hostilities in its broader sense, free from technical construction by acts of Congress, having a tendency to continue on paper only hostile conditions in times of peace.

9. Courts will not uphold acts done either under an abortive power or one equally as bad,—a power once good but inert through its own limitation.

10. Every reasonable intendment must be in favor of the validity of an order of the President under the Food and Fuel Act of Congress of August 10, 1917, c. 53, 40 St. L. 276.

11. If peace has not been actually declared, any matter directly or indirectly involved in the prosecution of the war within the scope of the act comes under the authority delegated by Congress, and, where this appears, the decision of the President should be final, and his action should not be questioned.

12. But where the circumstances which gave rise to the power no longer exist, or where the Executive acts outside of the scope of his authority, the rights of citizens must depend on things as they are and not on the protestations of administrative officers.

13. The courts will not accept the conclusion of military authorities, duly approved by the President, as to military necessity for exercising war powers.

14. It would seem acts done a year or so after the close of hostilities, before peace is actually signed, would scarcely be considered a military necessity, unless it was plainly apparent they were a direct result of such necessity.

15. The presidential order of October 30, 1919, reviving and continuing the authority of the Fuel Administrator over production, sale and distribution of bituminous coal, was an invalid exercise of the power conferred on the President by the Act of May 10, 1917, inasmuch as the armistice had been signed, hostilities had ceased for over a year, and the order was made merely in anticipation of a strike of bituminous coal miners.

16. Where the director general of railroads, acting as the head of fuel administration, has seized coal after the date of the presidential order of October 30, 1919, compensation must be awarded to the owner, not at the price fixed by the government, but at the market price at the time of conversion. This he is entitled to under the 5th Amendment of the Constitution of the United States.

17. In an action to recover such damages, suit is properly brought under the Act of Congress of February 28, 1920, c. 91, 41 St. L. 456, against the director general of railroads, and not against the United States eo nomine.

18. Where such a suit has been brought against the director, and he admits that he is properly named as defendant, and that he diverted the coal, there is an implied admission that he is the proper defendant.

Argued May 13, 1924. Appeals, Nos. 33 and 34, by defendant, from judgments of C. P. No. 4, Phila. Co., June T., 1921, Nos. 1367 and 1369, for plaintiff on cases tried by the court without a jury in suits of George B. Newton Coal Company v. James C. Davis, Director General of Railroads, operating the Philadelphia & Reading Ry. and Pennsylvania R. R. Before MOSCHZISKER, C. J., FRAZER, WALLING, SIMPSON, KEPHART, SADLER and SCHAFFER, JJ. Affirmed.

Trespass for wrongful conversion of coal. Before FINLETTER, J., without a jury.

The opinion of the Supreme Court states the facts.

Judgment for plaintiff in No. 33 for $3,386.49, and in No. 34 for $8,109.95. Defendant appealed.

*Errors assigned* were, inter alia, judgments, quoting them.

*William Clarke Mason,* with him *Charles Myers* and *John Hampton Barnes,* for appellant.—The court below was not correct in deciding that the orders of the fuel administration fixing prices for coal were issued on account of the threatened coal strike and not on account of the war emergency: Payne v. Industrial Board, 258 U. S. 613; Payne v. Stevens, 260 U. S. 705.

It would be a most unwise policy to allow courts to inquire into the motives of the executive branch of the government in making orders during the war emergency in order to determine their validity: Dahn v. Davis, 258 U. S. 421; Missouri P. R. R. v. Ault, 256 U. S. 554; Whiteside v. U. S., 93 U. S. 247.

The orders, under which the coal involved was diverted, were valid: Ford v. U. S., 281 Fed. 298; Lajoie v. Milliken, 242 Mass. 508; Hamilton v. Distilleries Co., 251 U. S. 146.

These actions should have been brought against the United States instead of against the director general of railroads.

The mere fact that the director general of railroads had been given the authority by the fuel administration to make diversions of coal does not change the situation, for in making such diversions he was acting in a different capacity from that in which he acted in receiving coal, as pointed out above and conceded by the court below. This was so decided by the District Court of Delaware in the case of Dexter & Carpenter v. U. S., 275 Fed. 566.

*Allen S. Olmsted, 2d,* with him *Wm. A. Glasgow, Jr.,* and *Saul, Ewing, Remick & Saul,* for appellee.—The President had no authority to exercise a war power to meet a domestic peace-time emergency: U. S. v. Cohen Grocery Co., 255 U. S. 81; C., M. & St. Paul Ry. v. Mc-Caull-Dinsmore Co., 253 U. S. 97.

When the government appropriates private property, it must pay the owner its fair market value.

The action was properly brought against the director: Corona Co. v. U. S., 263 U. S. 537.

OPINION BY MR. JUSTICE KEPHART, July 8, 1924:

Shortly after war was declared with Germany, Congress passed the Fuel and Food Control Act. Under it the President appointed an administrator with full authority to make such rules, regulations, prices, apportionment, etc., that would secure an adequate supply and equitable distribution, and facilitate the movement of food, fuel, etc. Under this delegation, many orders designed to promote the efficient conduct of the war were issued and enforced. Before the treaty of peace was adopted and signed, or in January and February, 1919, some time after the armistice and the cessation of hostilities, the President suspended all orders relating to the control of fuel except some unnecessary here to discuss. The fuel administrator went out of office the

following summer, and with his departure its fiscal and other affairs were closed. In the autumn, a nation-wide coal strike was threatened, and, on October 30, 1919, an executive order (Exhibit No. 12) was issued, wherein it is stated that "it is necessary to restore and maintain during the war certain rules, regulations, orders and proclamations." The President then revoked and annulled the "orders of January 31, 1919, and February 20, 1919, to the extent necessary to restore all of the said rules, regulations, orders and proclamations therein suspended concerning" fixing or regulating prices; and authority was given that "the fuel administrator shall, as occasion arises, restore, change or make such rules or regulations relating to the production, sale, shipment, distribution, apportionment, storage or use of bituminous and lignite coal as in his judgment may be necessary."

This was followed by an order of October 30th, by the fuel administrator, wherein "the director general of railroads and his representatives [were designated] to carry into effect the order of January 14, 1918, and to make such diversions of coal which the railroads under his direction may as common carriers have in their possession, as may be necessary in the present emergency to provide for the requirements of the country in the order of priority set forth in" a former preference order. This transfer of authority was made under the Overman Act (Act of May 20, 1918, c. 78, 40 St. L. 556).

A further executive order was issued November 5th, in substance much the same as the preceding one of October 30th, and another by the fuel administrator on November 12th, eliminating, in so far as the fixing of prices was concerned, "bona fide contracts enforceable at law entered into prior to October 30, 1919."

Acting under the authority thus transferred, the director general seized many cars of coal consigned to plaintiff on prior contracts for which plaintiff was paying the government price; it was used for railroad purposes. Plaintiff was thus deprived of fuel necessary for its com-

mitments, and, to relieve the shortage, went into the open market and purchased at increased prices the amount necessary to supply its demand. It sued the director general for damages as for an unlawful conversion of the coal consigned, and was awarded the full amount of its claim by the court below, trying the case without a jury. This appeal followed.

Aside from wartime regulations, the defendant would be bound to pay plaintiff as damages the market value of the coal converted: Hill v. Canfield, 56 Pa. 454, 459; 26 R. C. L. 1148; Norfolk & Western Ry. Co. v. Fort Dearborn Coal & Export Co., 292 Fed. 78; National City Bank of New York v. U. S., 275 Fed. 855, affirmed 281 Fed. 754; C. G. Blake Co. v. U. S., 275 Fed. 861, affirmed 279 Fed. 71; Muser v. Magone, 155 U. S. 240.

We have here presented, then, the questions whether the orders fixing prices and diversion of coal were lawful or in excess of the executive authority, and, if valid, was the consignee not entitled to just compensation for the loss sustained; and, finally, was the director general the proper defendant? In ascertaining whether the orders were illegal or exceeded executive authority, not only must the act in its entirety be considered, but also all relevant facts of record, and those of which judicial notice may be taken.

Price-fixing under proper conditions, like rate-making, is exclusively a legislative matter. To sustain acts in relation thereto an empowering statute must be pointed out. As yet it has not been determined there exists in the government an unlimited right to fix prices for all commodities, including the necessities of life. It has been held, under the police power of the several states, that the right exists by legislation or (the recognized substitute) by a delegation of legislative power to a commission to fix the rates of public service companies to be charged for their service or commodity. The right to fix similar rates for those companies engaged in inter-

state commerce has been held to exist under the federal Constitution.

During the war the authority to fix rates and provide exclusive regulation was extended to all commodities. "A state of war, however, may affect with a public interest articles which, under normal conditions, are free to commerce in its usual channels, and thus render subject to governmental regulation that which otherwise would be unobstructed and unhindered by the law": Lajoie v. Milliken, 242 Mass. 508, 136 N. E. 419, 433. The right was based on what has been generally termed implied "war power." The exercise of this right or power has as its foundation the national security and defense; it is of such paramount importance alike to the country and its citizens, and of such drastic consequence, it seems imperative it must not be carried beyond what is generally comprehended by the term, or into conditions of life not justifying its existence. When lawfully brought into action by Congress, it must be kept within its own limitations. It should not exist after the circumstances are ended through which it was brought into life, namely, war or public insurrection actually existing. Until the Supreme Court of the United States determines otherwise, the act in question must be held ineffective, after the cessation of hostilities in its broadest sense, freed from technical construction by acts of Congress, having a tendency to continue on paper only hostile conditons into a time of peace. With no reason of national import to justify its exercise, and without constitutional authority to sustain it, courts will not uphold acts done either under an abortive power or one equally as bad, —a power once good but inert through its own limitation.

The reason is obvious. To hold otherwise, the supreme sovereign at any time may enter and dictate the most ordinary affairs of life, as may an absolute monarch. Up to the present at least, the toleration of this in peace times is unthinkable under our system of govern-

ment.   We do not assert, that when even peace prevails
as contrasted with a state of war, domestic conditions
may not assume such serious import as to be akin to an
insurrection, though force of arms be not used; when
such condition arises Congress should publicly declare
it; executive officers should not be forced to use legisla-
tion intended for other purposes to justify their acts.
Apportionment of commodities or diversion of fuel
stands in the same position in this respect as fixing
prices.

The Food and Fuel Act, through its many sections,
uses various terms to express the dominant purpose.
But it is well summed up in section 25, under which
the director general assumed his authority.   So much of
it as is necessary for our consideration reads: "The
President of the United States......is hereby author-
ized and empowered, whenever and wherever in his judg-
ment necessary *for the efficient prosecution of the war,*
to fix the price of coal and coke,......to *regulate the
method of distribution, apportionment,* [*etc.*];......
said authority and power may be exercised by him
......during the war or for such part of said time as in
his judgment may be necessary": Act of Aug. 10, 1917,
c. 53, 40 St. L. 276, 284.

It must be conceded every reasonable intendment must
be in favor of the validity of the order; peace not being
actually declared, any matter directly or indirectly in-
volved in the prosecution of the war within the scope of
the act comes under the authority delegated by Con-
gress; and, where this appears, the decision of the Presi-
dent should be final: Hamilton v. Kentucky Distilleries
& Warehouse Co., 251 U. S. 146.   Nor should the reasons
for his action be open to question.   When orders are
made for the efficient prosecution of a war, "a thing
actually existing," it must be assumed his acts were in
good faith, from a proper motive and for the purpose
named.   But it is equally clear, where the circumstances
which gave rise to the power no longer exist, or where

the Executive acts outside the scope of his authority, the rights of citizens must depend on things as they are, and not on the protestations of administrative officers: Yick Wo v. Hopkins, 118 U. S. 356, 373; Ex Parte Virginia, 100 U. S. 339. Even the "war power" of Congress is subject to applicable constitutional limitations: Hamilton v. Kentucky Distilleries & Warehouse Co., supra.

It has been held that, in war time, the courts will not accept the conclusion of military authorities, duly approved by the President, as to military necessity for exercising war powers: Ex Parte Milligan, 4 Wall. 2. And, if this is still the law, it would seem acts done a year or so after the close of hostilities, before peace is actually signed, would scarcely be considered a military necessity, unless it was plainly apparent they were a direct result of such necessity.

Under section 25 of the act, the restoration order of October 30th could be issued only if a state of war continued, and the order was promulgated as a war measure. It must be conceded that more than a year before it was issued Germany was hopelessly defeated, her armies disbanded, her fleet surrendered or destroyed, and much of her physical properties, including vast quantities of war material, turned over to the victorious countries. Shortly after the armistice, our own army was disbanded, and when the restoration order was issued our economic life was on a peace basis, with the usual troubles incident thereto. Meanwhile, the President in person had signed a treaty of peace with Germany at Versailles. He had, in vetoing the Volstead Act, publicly asserted, "Where the purposes of particular legislation arising out of war emergency have been satisfied, sound public policy makes clear the reason and necessity for repeal": 58 Congressional Record, 7607, October 27, 1919.

After February, 1919, as stated above, the fuel administrator voluntarily relinquished his office, and between that date and October 30th no phase of the war, qua war,

existed. It is not pretended that the basis of the President's order of the latter date was a finding or judgment that it was necessary for the efficient prosecution of the war, nor is any effort made in this record to show such was the case, or that it was directly or indirectly a natural or normal consequence of the war. History shows it was not, and the records are all to the contrary.

In the report of February 23, 1920, to the President of the Senate, the director general states that the executive order of October 30th was issued "in anticipation of a strike of bituminous coal miners, expected to commence November 1, 1919," and, because the production of coal fell off, diversions of coal were necessary.

On this statement of the case it must be apparent that the underlying purposes for which the act was passed were successfully accomplished, and long since a matter of history; it is just as apparent no legal order such as the ones in question could be founded on that act. The restoration of the order was not in any way connected with the war, and, as it affected but a part of that community, it falls into that class of private life which the government has not as yet attempted to regulate.

Even if the Versailles treaty had not been approved by the Senate, or one had been lawfully executed by the two governments, what has been said above is ample to show the restoration order of October 30th was not a war measure under the act, and consequently must be held to be invalid. The purpose for which the act was passed no longer existed, and an order based on the "present emergency," the anticipation of a coal strike, could hardly be considered as being related to the "efficient prosecution of the war." Nor would any official statement make it so, if one had been made.

That such is the judicial trend of thought is evidenced from a consideration of cases involving the United States Shipping Board, and the allied agencies of government.

The case of Hamilton v. Kentucky Distilleries & Warehouse Co., supra, involving the right of the United States

to conserve its man power and increase efficiency of production by forbidding sale or removal of liquors from bonded warehouses for beverage purposes, does not control the instant case. As stated by an eminent jurist, "It is clear that there is a broad distinction between the rights of liquor dealers and constitutional rights of the one dealing in coal, a necessary commodity, and a business which has nothing of that evil tendency of the manufacture and sale of liquor. Liquor dealers have constant notice that their business is subject to drastic regulation and restraint in legislative discretion, and that the incidental losses by reason thereof, however heavy, must be borne by those risking their capital in it. The distinction between the two kinds of business is clearly made in Mugler v. Kansas, 123 U. S. 623, and Stone v. Mississippi, 101 U. S. 814. It follows that fixing prices for coal and regulating its distribution, if valid, is a field of policing in which much greater care must be exercised by the legislative power to see that it does not constitute a sacrifice of the property whose price is fixed or whose disposition is regulated, than in restricting the sale of liquor."

The cases relied on by the appellant, Ford v. U. S., 281 Fed. 298, reversed 44 Sup. Ct. R. 300, and Lajoie v. Milliken, supra, concern the conduct of the fuel administration during and not after the war.

Although no case within our knowledge has directly passed on the questions now being considered, some come close to the issue; all support our conclusion: Dexter & Carpenter v. Davis, 281 Fed. 385; U. S. v. Cohen Grocery Co., 255 U. S. 81; U. S. v. New River Collieries, 262 U. S. 341, 342. In the last-named case it might appear some of the coal was moved during the effective period of the regulations, but as a matter of fact such was not the case.

If we should be in error in holding the regulations were without authority in law, and the defendant must pay the market value in accordance with the legal prin-

cipal involved, defendant's situation is not improved, as, by the Fifth Amendment to the Federal Constitution, just compensation must be made to the plaintiff in the same measure of damages.

While the authority of the President, under section 25, may be exercised "during the war or such part of the said time as in his judgment may be necessary," this does not have the effect of granting greater power than is embodied in the previous part of the section; it has relation solely to a state of actual war,—a condition then existing. It is urged that Hamilton v. Kentucky Distilleries Co., supra, held "Congress is given certain powers in war time which even the Fifth Amendment does not limit or restrict." The case asserts no such proposition. Mr. Justice BRANDEIS says (p. 156) that "the Fifth Amendment imposes in this respect no greater limitation upon the national power than does the Fourteenth Amendment upon state power," and within the scope of its legal operation this of course is true. "But the exercise of the war powers is (except in respect to property destroyed by military operations, United States v. Pacific Railroad, 120 U. S. 227, 239) subject to the Fifth Amendment: United States v. Russell, 13 Wall. 623, 627." Just compensation must be made for private property taken for war purposes. This is not only well settled but based on sound morals: U. S. v. Cohen Grocery Co., supra.

The owner of property taken under the Lever Act is "entitled to the full money equivalent of the property taken, and thereby to be put in as good position pecuniarily as it would have occupied if its property had not been taken: Seaboard Air Line Ry. Co. v. United States, 261 U. S. 299, and cases cited. The ascertainment of compensation is a judicial function": U. S. v. New River Collieries, supra, 343, 344.

To declare what the compensation for plaintiff's coal should be, and to prescribe rules for taking it, regardless of the owner's loss, would be to take this property out

of the protection of the Fifth Amendment. "The government, as a war measure under the exercise of governmental powers, may fix prices, either directly or by governmental regulations necessarily reducing the prices; but this does not authorize it to acquire the property in invitum at such reduced prices": National City Bank v. U. S., supra. The plaintiff was entitled to judicial ascertainment of his damages. This he secured through the action of the court below. The compensation was fixed at the amount of the judgment, and unless the action should have been against the United States, the judgment should be affirmed.

The court below, on this latter question, states: "The defendant however insists that the suit should then have been brought against the United States, eo nomine, and not against the director general of railroads. And so it should, if Congress had not otherwise directed by [sec. 206 of the] Act of February 28, 1920 [c. 91, 41 St. L. 456, 461], which provides that, 'Actions at law......based on causes of action arising out of the......operations by the President of the railroad......of any carrier [under the provisions of the Federal Control Act] ......of such character as prior to federal control could have been brought against such carrier, may, after the termination of federal control, be brought against an agent designated by the President for such purpose.'"

The action is based on section 206 of the Transportation Act, and it must be held to be one that arises out of the possession, use or operation by the President of the railroads involved during federal control.

While some stress is laid upon the dual capacity of the director general as head of the fuel administration, and at the same time director general, yet cutting through the screen of titles and authority, the fact is that, under the order of the director general, coal was seized and used by the defendant. The companies received the benefit of it, and now seek to pay only the price fixed by the government, and refuse compensation to the plaintiff for

its undoubted loss sustained by the taking. This they cannot do. Conversion must be followed by just compensation. The party benefited was the defendant in this suit; the director general is properly named as the defendant. In the suit against him while operating the Philadelphia and Reading Railway Company, he expressly admits he is properly named as defendant, and in the Pennsylvania Railroad Company Appeal he expressly admits he diverted the coal; this necessarily carries with it an implied admission that he is the proper defendant.

Other points of minor importance, not discussed in this opinion or in the briefs, raised in the assignments of error, are immaterial.

All the assignments are overruled and the judgment of the court below is affirmed.